254 F.2d 827
 Walter SCHNEIDER, John J. Vogler and Julian J. Bursten, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
McKESSON & ROBBINS, Incorporated, a corporation and Guaranty Trust Company of New York, a corporation.
 No. 218.
 Docket 24799.
 United States Court of Appeals Second Circuit.
 Argued March 7, 1958.
 Decided May 1, 1958.
 
 Baker, Garber & Chazen, Hoboken, N. J. (Nathan Baker, Hoboken, N. J., of counsel; Bernard Chazen, Hoboken, N. J., on the brief), for plaintiff-appellants.
 Hodges, Reavis, McGrath & Downey, New York City (C. Frank Reavis, Martin D. Jacobs, Robert Thrun, Frederick R. Adler and Laurence C. Ehrhardt, New York City, of counsel), for defendant-appellee McKesson & Robbins, Inc.
 McGuigan & Kilcullen, New York City (E. Gayle McGuigan, New York City, of counsel), for defendant-appellee Guaranty Trust Co.
 Before LUMBARD, WATERMAN and MOORE, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 The appellants, suing on behalf of themselves and all others similarly situated, commenced this action in the District Court to establish the extent of their interest in certain funds held by the defendant Guaranty Trust Company under a trust agreement entered into between Guaranty Trust and the defendant McKesson & Robbins, a former employer of the appellants. McKesson & Robbins' defense motion for summary judgment, accompanied by supporting affidavits, was granted by the District Court.
 
 
 2
 McKesson & Robbins is a Maryland corporation employing approximately 9,000 persons. Its business consists of (1) wholesale distribution of drug products through 75 selling offices and warehouses (sometimes referred to as "divisions") located in 34 states and Hawaii, (2) wholesale distribution of wines and liquors through 42 selling offices in 16 states and Hawaii, (3) distribution of chemicals through 6 district offices, 30 branch sales offices and 37 warehouses, and (4) manufacture of a line of drug products distributed through the company's wholesale offices. In 1944 McKesson & Robbins instituted a pension plan for the benefit of its employees. Under the plan the employees who qualify as "participants" are entitled to retire at age 65 (or, in the discretion of the board of directors, at age 60) with an annual retirement allowance computed in accordance with the terms of the plan. Participation in the plan, which commences as soon as an employee is eligible, is limited to employees who have attained age 30 and completed one year of service, with the added provision that the employee to be a "participant" "shall have at least 15 years of creditable service by the time he attains age 65." The plan further provides that "If a participant ceases to be an employee for any reason whatsoever * * * his participation shall thereupon terminate * * *" In addition, Section 9(5) of the plan specifies that "The establishment of the Plan shall not be construed as conferring any legal rights upon any employee or any person for a continuation of employment, nor shall it interfere with the right of an Employer to discharge any employee or deal with him without regard to the existence of the Plan."
 
 
 3
 The pensions established by the plan are payable out of a trust fund of which the Guaranty Trust is trustee. All contributions to the fund are made by the employer. The amount of such contributions is determined actuarially in accordance with the projected benefits payable under the plan, but all contributions are voluntary, and the employer retains the right to discontinue its contributions or to reduce them below the amount necessary to provide adequate funds for the payment of pensions. Section 8 of the plan provides that "All assets of the Plan shall be held as a special trust for the benefit of participants and retired participants, and in no event shall it be possible * * * for any part of the assets of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of such participants or retired participants. No person shall have any interest in or right to any part of the earnings of the trust, or any rights in, or to, or under the trust or any part of the assets thereof, except as and to the extent expressly provided in these Rules." The plan may be terminated at any time by McKesson & Robbins' board of directors. If the plan is terminated, all assets are to be used for the benefit of participants and retired participants, each of whom is entitled to a proportionate share of the net assets of the trust fund.[1]
 
 
 4
 On the date that the complaint herein was filed, the plan had been in effect approximately twelve years. During this time McKesson & Robbins opened 11 new drug divisions and 14 new liquor divisions. In the same period it had discontinued ten liquor divisions and two drug divisions. Each of the three appellants was employed by McKesson & Robbins at its drug division in Newark, New Jersey, one of the two discontinued drug divisions. When the Newark division was closed in 1955, 172 of McKesson & Robbins' 8,500 employees were employed there. Of the 8,500 employees 5,438, including 103 employed at the Newark division, were participants in the pension plan. Fifteen of the Newark participants continued their employment with McKesson & Robbins, so that 88 participants, including the three appellants, were no longer employed. These 88 employees constituted approximately 1.6% of the total number of employees participating in the plan.
 
 
 5
 The appellant Schneider, at the time the Newark division was closed, was 52 years old and had been employed by McKesson & Robbins for 21 years, all of which constituted "creditable service"[2] under the pension plan. The appellant Vogler, who was 45 years of age, had been employed by McKesson & Robbins for 25 years, 15 of which constituted "creditable service." The third appellant, Bursten, was 43 years old and had 9 years of "creditable service." There is some dispute in the record before us whether, when the Newark division was closed, the appellants were offered the opportunity of continuing their employment with McKesson & Robbins. For the purpose of this appeal, we accept the appellants' claim that they were not given such an opportunity.
 
 
 6
 We think it is readily apparent from the facts set forth above that the appellants have no interest in the pension fund. Under the express terms of the plan the fund exists for the sole benefit of participants and retired participants. As the appellants had not attained age 65 at the time they were discharged, or had not reached age 60 so as to be eligible for retirement by special vote of the board of directors, they cannot claim an interest in the fund as if they were "retired participants." Nor will they, upon attaining age 65, be entitled to a pension. Under the plan pensions are payable only to participants. The appellants ceased to be participants when they were discharged.
 
 
 7
 The interest of participants under the plan in the trust fund is limited to their contingent rights to receive a pension at age 65 and to their rights to share in the trust fund if the plan is terminated. Since the appellants are not entitled to a pension either presently or in the future, they can establish an interest in the pension fund only if the plan has been terminated. In this connection, appellants rely upon Longhine v. Bilson, Sup. Ct. Niagara Co.1936, 159 Misc. 111, 287 N.Y.S. 281, in which the court decreed partial distribution of the assets of an association the by-laws of which were similar to the rules of the pension plan here. Whatever the precedent value of that decision, and we note that it cited no authorities and that it has never been cited in a later decision, it is not controlling here. In that case approximately one-half of the members of the association were discharged en masse when one of the two manufacturing corporations whose employees constituted the membership of the association terminated its operations. The court rested its decision upon the ground that when the association had been formed the eventuality which had occurred had not been contemplated. The circumstances of the present case are otherwise. The opening and closing of sales offices is a normal incident of the business which McKesson & Robbins conducts. Its operations are not, as in Longhine, limited to two plants each of which employs approximately an equal number of employees. Rather, it conducts its business through a large number of offices, the precise number of which varies according to business conditions. The closing of the Newark division did not result in a marked contraction of corporate activity. Moreover, in Longhine, approximately one-half of the employees were discharged because of the discontinuance of the corporation's activities; whereas in the present case only 1.6% of McKesson & Robbins' employees lost their positions. Under these circumstances it cannot realistically be said that the pension plan was terminated or "partially terminated" when the Newark division was discontinued.
 
 
 8
 The appellants urge upon us certain equitable considerations, as, for example, their reliance upon the plan, and contend that a court of equity should fashion a remedy to prevent the injustice which it is claimed will result if they are denied participation in the fund. But, as the court below stated, there is no justification for a court "to twist the Plan into something it clearly is not." Whatever reliance the appellants may have placed upon their expectation of future pension rights, the terms of the plan clearly indicate that all interest in the pension fund ceases when the employment relationship is severed. Perhaps an even more important consideration, insofar as the appellants rely upon equitable considerations, is that under the plan, and in practice, the amount of the employer's contributions have been determined in accordance with an actuarial formula which takes into account that any employee who does not continue his employment with the company until retirement age is not entitled to any benefits under the plan. If rights in the trust fund were to be created for appellants and all others similarly situated, the most probable result would be the dilution of the interests of those who are participants in the plan. We see no equitable justification for thus favoring the appellants over those employees who are still qualified under the plan.
 
 
 9
 The sole remaining issue is whether the District Court erred by disposing of the appellants' claims by summary judgment. In the language of Rule 56(c), Fed.Rules Civ.Proc., 28 U.S. C.A., summary judgment may be granted when "there is no genuine issue as to any material fact * * *". On the record before us, it is clear that no such issue exists. The terms of the pension plan are clear and unambiguous; and the appellants do not dispute the material facts contained in the affidavits made in support of the motion. Under these circumstances, the courts have often recognized that the summary judgment procedure is a proper method for the adjudication of claims requiring the interpretation of documents. See 6 Moore's Federal Practice ¶ 56.17. In Subin v. Goldsmith, 2 Cir., 1955, 224 F.2d 753, we indicated a certain reluctance to grant summary judgment when the facts asserted by the movant in support of his motion are peculiarly within his knowledge, but we did not, as the appellants appear to contend, hold that under such circumstances summary judgment can never be granted. See Radio City Music Hall Corp. v. United States, 2 Cir., 1943, 135 F.2d 715. Resolution of the issues raised in Subin v. Goldsmith was largely dependent upon the opinions and good faith of the individual defendants, and independent verification of the facts necessary to establish the plaintiff's case was virtually impossible. Hence, cross-examination and an opportunity for the trier of fact to observe the demeanor of witnesses was crucial to the plaintiff's case. Cf. Alvado v. General Motors Corp., 2 Cir., 1955, 229 F.2d 408; Fogelson v. American Woolen Co., 2 Cir., 1948, 170 F.2d 660.
 
 
 10
 In the present case, by contrast, analysis of the issues raised by the appellants reveals either that they are irrelevant or that the facts necessary to sustain them were not inaccessible to the appellants. Thus the appellants suggest that the plan may not have been operated in accordance with the rules which govern it; and the appellant Schneider, in his affidavit in opposition to the motion for summary judgment, states on information and belief that an employee of McKesson & Robbins was retired prior to his having attained age 65. The relevance of these assertions, assuming that they may be proven, is not, however, made clear by the appellants. We may assume that as participants in the plan the appellants would have a sufficient interest in the pension fund to object to the distribution of funds other than in the manner specified by the plan. Nevertheless, as we have indicated, the appellants ceased to be participants when they were discharged. If a portion of the funds have been improperly expended, the appellants have in no way suffered. Even if we interpret appellants' contention as a suggestion that in practice the terms of the plan have been modified, the mere suspicion of such a modification cannot serve to create a genuine issue of fact. Cf. Banco de Espana v. Federal Reserve Bank, D.C.S.D.N.Y.1939, 28 F. Supp. 958, 973, affirmed 2 Cir., 114 F.2d 438. The facts which might justify such a suspicion were not inaccessible to appellants. The complaint herein was filed on November 28, 1956. McKesson & Robbins did not move for summary judgment until nearly four months later, and the District Court's decision on the motion was not rendered until June 28, 1957. During this entire period the appellants might have utilized the liberal discovery procedures authorized by the Rules. As Professor Moore notes:
 
 
 11
 "Since on the whole the deposition and discovery rules provide effective means of obtaining evidentiary materials, unless the opposing party is unduly hurried to a hearing on a motion for summary judgment he has access to proof, as a general proposition, even where the essential facts are within the knowledge or control of the movant." 6 Moore's Federal Practice 2136.
 
 
 12
 Had the appellants utilized the discovery procedures available to them, they might have obtained information tending to verify their suspicions, but their failure to do so precludes us from finding that they have raised any factual issues which may be considered "genuine." Their failure to make use of the discovery procedure is also destructive of the contentions that they have not had a sufficient opportunity to test the veracity of facts stated in the supporting affidavits, and that there has been no opportunity for them to determine whether the Newark division was treated by McKesson & Robbins as such a distinctly separate business entity from the rest of the corporate business that the Newark discontinuance should be considered as a partial termination of the plan to the extent of the Newark percentage participation, Orvis v. Brickman, 1952, 90 U.S.App.D.C. 266, 196 F.2d 762. The appellants were not entitled to a denial of the motion merely on the basis of a hope that some evidence might develop at the trial. Radio City Music Hall Corp. v. United States, supra.
 
 
 13
 The appellants do raise one issue of "good faith," suggesting that the Newark division may have been discontinued in order to deprive them and others similarly situated of their rights under the pension plan. We mention this suggestion merely to indicate that it has not been overlooked. It is completely alien to any theory suggested in the complaint, and the opinion of the District Court clearly indicates that no such theory was suggested below.
 
 
 14
 We conclude that the appellants have no interest in the pension fund. Since there is no "genuine issue as to any material fact" the defendants' motion for summary judgment was properly granted.
 
 
 15
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 When the plan was commenced in 1944, and periodically during the intervening years, McKesson & Robbins distributed circulars to its employees explaining the provisions of the plan. The statements contained in these circulars were in no way misleading. Examination of them indicates that they accurately set forth the content of the plan
 
 
 [2]
 "Creditable service" is defined in the plan as the total number of years, not to exceed 35, during which an employee receives credit as a participant in the plan