Herman L. FINNELL et al., Appellants,

v.

CRAMET, INC., Oil, Chemical and Atomic Workers International, AFL–CIO, et al., Appellees.

No. 14145.

United States Court of Appeals Sixth Circuit.

April 19, 1961.

Jess Parks, Jr., of McAllester, Parks, & McAllester, Chattanooga, Tenn., for appellants.

Hamilton Smith, of McDermott, Will & Emery, Chicago, Ill., Will Allen Wilkerson, Chattanooga, Tenn., John L. Lenihan, of Miller, Martin, Hitching & Tipton, Chattanooga, Tenn., on brief, for Cramet Inc.

William E. Rentfro, Denver, Colo., Will Allen Wilkerson, of Wilkerson & Abshire, Chattanooga, Tenn., for Oil, Chemical & Atomic Workers, etc.

Before McALLISTER, Chief Judge, MILLER and O'SULLIVAN, Circuit Judges.

SHACKELFORD MILLER, Jr., Circuit Judge.

Appellants filed this action against the appellee Cramet in the Chancery Court of Hamilton County, Tennessee, as a class action for the benefit of themselves and 499 employees of appellee Cramet, Inc., who were similarly situated. It seeks to recover for all members of the class their proportionate share of a pension fund which was established by the appellee Cramet for the use and benefit of its employees, which fund was distributed among certain employees of Cramet, excluding the appellants, when it terminated its operations and transferred its facilities to the Government.

The action was removed to the United States District Court, where an amended complaint was later filed, adding as defendants along with Cramet, Oil, Chemical and Atomic Workers International, AFL-CIO, and Local Union 9–671, hereinafter referred to as the Unions. The action was dismissed by the District Judge in a summary judgment proceeding.

The facts are largely stipulated, supported by numerous documentary exhibits and supplemented by depositions.

Cramet was incorporated in Delaware on February 20, 1953, and thereafter qualified to do business in Tennessee. At that time it was a wholly owned subsidiary of Crane Company, a nationally known manufacturer of valves, fittings and plumbing supplies. It was engaged in the production of titanium sponge metal for use primarily in the aircraft industry and for purchase essentially by the United States Government. Crane Company had adopted a pension plan on September 11, 1950, which plan was adopted by Cramet for its own employees on December 1, 1953. On June 5, 1956, Cramet established a plan of its own and on December 20, 1956, entered into a pension Trust Agreement with Continental Illinois National Bank & Trust Company of Chicago as Trustee. Under the Plan, employees having fifteen years continuous service with Crane Company and its subsidiaries and having either reached their 65th birthday or having become permanently disabled were eligible to retire and to receive a pension in accordance with the Plan. Cramet agreed to make contributions to the Trustee in such amounts as might be required under accepted actuarial principles to maintain the Plan and the Trust Fund in a sound actuarial condition. The Trust Agreement provided that no employee would be required to make any contributions under the Plan, and no employees of Cramet ever made any such contributions. Both

the Plan and the Trust Agreement provided that they should be construed and administered in accordance with the laws of the State of Illinois. The Trust Agreement also provided that it could be amended by the Company from time to time, subject to certain limitations, one of which was that under no condition could an amendment permit the return to the Company of any part of the Trust Fund.

On July 31, 1953, Cramet entered into a contract with the General Services Administration of the United States Government, under which Cramet agreed to produce titanium sponge for the Government and the Government committed itself to purchase up to 6,000 tons of the sponge. By December 1957 Cramet had used up all but slightly more than 500 tons of its 6,000 ton option. At the same time no commercial markets were developed. In December 1957 it became imperative that Cramet find some means of disposing of its facilities and of going out of business. On March 7, 1958, a contract of sale was made between Cramet and the General Services Administration under which Cramet sold its facilities to the General Services Administration at a closing to be held March 17, 1958, it being provided, however, that the operations of Cramet after December 31, 1957, would be for the account of the Government. On March 17, 1958, the closing was held and the Cramet business thereafter wound up.

The Trust Agreement provided that upon termination of the Trust and the Plan the assets of the pension fund should be distributed, first, to assure pensions for life for those who were already receiving pensions on the date of termination. Secondly, the remaining assets should be used to pay pensions to those who on the termination date had qualified to receive pensions but had not begun to receive them. Finally, the remaining assets were to be allocated to those who on the termination date had fifteen years of continuous service but who had not reached the age of 65 or become permanently disabled.

In March 1958 there were seven employees, none of them appellants here, whose total continuous service within the terms of the pension plan exceeded fifteen years. No employees had qualified to receive pensions, however, and these seven employees would have therefore shared the entire pension fund if the Plan had not been amended.

On March 15, 1958, representatives of Cramet met with the negotiating committees of the unions and announced that the operation of the plant would be discontinued. Following this meeting Cramet sent out a notice to the employees of the discontinuance of business and the reasons therefor. On March 18, 1958, a further meeting was held between the representatives of the Company and the unions. At this meeting the Company representative presented a letter providing for the allocation of the pension fund on the following bases. Each employee's portion of the fund would be based on his length of service with the Company through December 31, 1957, and his earnings during 1957 as reported on revenue form W–2, the allocation to any employee in no event to be less than $200.00. The term "employee" for the foregoing purposes included only those employees who had completed one or more years of continuous service with the Company on December 31, 1957, whose continuing service with the Company was not broken prior to that date and who either (a) performed work for the Company during the last pay period in the calendar year 1957, or (b) failed to perform work for the Company during such payroll period because of an excused absence other than a layoff. This letter was signed by the president of the Company, by the International Representative and by representatives of the negotiating committee of the local union. At a meeting of the union held on March 24, 1958, the president of the union read a letter relating to the amended plan of allocation. No member of the union objected, although no person not participating in the distribution was present.

On March 20, 1958, a letter was sent out by the Company to all laid off Cramet employees which stated, "As a result of termination of operations of this Company, we regretfully inform you that your services are terminated as of March 21, 1958."

An amendment to the Cramet pension trust revising the plan of allocation in line with the Company's letter of March 18 was adopted on March 24, 1958, and ratified by the Company's Board of Directors on March 27, 1958. There was in the pension trust fund available for distribution to employees $315,864.71, with $500.-00 additional available to compensate the Trustee. This sum was distributed among the 427 employees who met the standards as set forth in the amended plan of allocation. At the time of this action there were no funds remaining in the pension fund.

The six plaintiffs who filed this action were all relatively young men when they applied for work at Cramet. Their ages ranged from 18 to 35 years. As of March 1958 the oldest was 38. They were employed by Cramet for periods ranging from one year to slightly more than three years. They were laid off prior to the last payroll period in 1957. Accordingly, they did not qualify to receive and did not receive, any portion of the pension fund under the revised plan of allocation stated in the Company's letter of March 18, 1958, and adopted on March 24, 1958. There were 499 other employees of Cramet in the layoff status on December 31, 1957, who for the same reason did not receive any portion of the pension fund.

It was stipulated that no officer, director or agent of Cramet at any time promised any of the named appellants, orally or in writing, that he would receive pension benefits other than those provided for in the Plan and Trust, nor did any of them at any time make any material misrepresentations regarding the pension to any of the named appellants. No funds were at any time deposited in the pension fund for the benefit of particular named employees, nor were any funds so deposited allocated to particular named employees after deposit.

■ The present action attacks the validity of the distribution of the pension fund, and seeks to recover for the 505 former employees in layoff status on December 31, 1957, the proportionate share of the pension fund to which each employee "is equitably entitled." It sought reference to a Master for the taking of proof to prove their employment periods, pay rates and other matters which would establish the amount which each should receive in an equitable distribution of the pension fund. In the amended complaint it is alleged that, although it is true that the complainants did not actually perform work for the Company on December 31, 1957, because they were in a layoff status, they nevertheless were employees for whose benefit the Plan was set up, and as employees, whether actually working on December 31, 1957, or not, were entitled to share along with all other employees in the distribution of the pension fund, and that the defendant unions acting through their authorized agents and the defendant Company did arbitrarily, and in a discriminatory manner, wrongfully enter into an unlawful agreement and civil conspiracy, in bad faith, denying the complainants their just rights under their employment contract, to the detriment of the complainants and to the mutual benefit of a select minority group of 427 employees, who received a much greater share than would ordinarily have been due them because of the omission of the complainants from the list of those entitled to participate in the lump sum payments.

Appellants' claim appears to be based upon the proposition that the Plan and pension fund were set up by the employer for the benefit of its employees; that in the handling of the fund and in the distribution of it upon the termination of business by the employer, the employer was acting in a fiduciary capacity without right to arbitrarily discriminate between employees; that under principles of equity the rights of employees in a "lay-

off status" on December 31, 1957, were no different from the rights of other employees who happened to be physically on the job on the specified date of December 31, 1957; and that the classification of employees into those eligible to share in the distribution of the pension funds and those not so eligible, based upon whether they were or were not working on December 31, 1957, a day arbitrarily selected by the employer, was a discrimination against those in a "layoff status," in violation of its fiduciary obligations to all of the employees. It is pointed out that although appellants were in a "layoff status" on December 31, 1957, the Company recognized them as "employees," in that the Company's notice of March 20, 1958, advised them that as a result of its termination of operations "your services are terminated as of March 21, 1958."

There might be merit in this contention if we were being called upon to determine whether, in the absence of any contractual obligations imposed by the creator of the Plan and the fund at the time of the creation, the proposed distribution was a fair and equitable one. But the contention ignores several material provisions of the Plan under which the fund was set up.

Section VI of the Pension Plan provides:

"This Plan is strictly voluntary on the part of the Employing Companies, and shall not be deemed to constitute a contract between any one or more of the Employing Companies and any Employee or to be a consideration for, or an inducement or condition of, the employment of any Employee. Nothing in this Plan shall be deemed to give any Employee the right to be retained in the Service of an Employing Company or to interfere with the right of the Employing Company by which he shall then be employed to discharge any Employee at any time."

The same section also provides:

"The Corporation reserves the right to modify or amend in any respect or terminate, in whole or in part, this Pension Plan at any time for any reason whatsoever, * * *."

The section also provides:

"No Employee prior to his retirement under conditions of eligibility for pension benefits under this Plan shall have any right or interest whatsoever in or to any portion of any funds which may be paid into any pension trust established for the purpose of paying pensions and no Employee or Pensioner shall have any right to pension benefits except to the extent provided in this Plan."

We think that under the foregoing provisions of the Pension Plan and under the applicable Illinois Law, the appellants, having not yet qualified for a pension of any kind, had no vested rights in the pension fund. Umshler v. Umshler, 332 Ill.App. 494, 76 N.E.2d 231; Menke v. Thompson, 8 Cir., 140 F.2d 786, 790–791; Schneider v. McKesson & Robbins, Inc., 2 Cir., 254 F.2d 827, 829–830; Hughes v. Encyclopaedia Britannica, D.C.N.D.Ill., 108 F.Supp. 303, reversed for lack of jurisdiction, 7 Cir., 199 F.2d 295; Annotation, 42 A.L.R.2d 464, 483.

Appellants' so-called rights in the pension fund were actually not rights at all, but were in the nature of expectancies, and as such were subject to the terms of the instrument under which they arose. The Pension Plan, under which they arose, expressly gave the company the right to amend or terminate, in whole or in part, the Plan at any time for any reason whatsoever. In acting under this expressly reserved power, the Company and the Trustee breached no legal rights of the appellants. The position of the appellants appears analogous to the "interest" of named beneficiaries in a will prior to the death of the testator, who, at any time before death, can change the will and eliminate the expectant legatee without liability to himself or his estate. Since the appellants had no enforceable interest in the Trust Fund, the judgment dismissing the action against both the Company and the unions was properly entered.

■ Appellants contend that the Court erred in disposing of the case by summary judgment. There was no dispute about the facts upon which the case was decided, most of them being stipulated, even though depositions were taken and numerous exhibits were presented to the Court for its consideration. The case was essentially one involving a question of law and in our opinion was a proper case for summary judgment procedure. Schneider v. McKesson & Robbins, Inc., supra, 2 Cir., 254 F.2d 827, 830–831.

The judgment is affirmed.