**Joseph K. KNOLL et al., Appellants,**

v.

**PHOENIX STEEL CORPORA-
TION et al.,**

No. 71-1536.

United States Court of Appeals,
Third Circuit.

Argued April 17, 1972.

Decided Aug. 25, 1972.

James J. McCabe, Jr., Duane, Morris & Heckscher, Philadelphia, Pa., David T. Sykes, Philadelphia, Pa., for appellants; Richard L. Kearns, Harrisburg, Pa., of counsel.

Norman M. Berger, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa. and Raymond K. Denworth, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., Hayward H. Coburn, Philadelphia, Pa., for appellees.

Before ADAMS, GIBBONS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

This is an appeal from an order of the District Court for the Eastern District of Pennsylvania, 325 F.Supp. 666, granting the motion of the defendants, appellees herein, for summary judgment. The case arises from the cessation of operations of the Plate Division Plant of the Phoenix Steel Corporation (Phoenix) at Harrisburg, Pennsylvania, on December 31, 1960. Since Phoenix had no nearby plant to which the employees of the Plate Division Plant could transfer, many lost their means of livelihood.

The plaintiffs, appellants herein, were employees of the Plate Division Plant, and members of a pension fund, established in 1950 by an agreement between Phoenix and the United Steelworkers of America (USW) which was the collective bargaining agency for the Plate Division Plant employees. Section 17 of the plan provided for "Disposition of Fund upon Termination." How this section should be interpreted forms the crux of this case on appeal. The district court succinctly summarized the operative provisions of Section 17 as follows:[1]

Essentially, it provides that those receiving pensions, and those at the re-

---

1. The complete text of Section 17 is as follows:

"Section 17: *Disposition of Fund upon Termination*

Upon termination of Plan, either as a whole or partially as to a Participating Employee group at one or more of the plants covered by the Plan, the assets then held in the Fund shall be allocated by the [Retirement] Board on the basis of actuarial valuation to or among the several Participating Employee groups at the respective plants. In making such allocation the Board shall be entitled to rely upon certificates, reports and other data furnished by the actuary. In no case shall the funds so allocated with respect to a Participating Employee group exceed the sum of the funds held at December 31, 1959 and the contributions made subsequent thereto by the Company with respect to such group, plus annual interest at the earned rate, less the benefits paid hereunder subsequent to December 31, 1959 with respect to such group.

"For each Participating Employee group as to which the Plan is terminated, the assets of the Fund allocated to that group shall be further allocated, to the extent that they shall be sufficient after making provision for ex-

penses, by the Trustee at the direction of the Board in the following order of precedence:

"(a) to assure the continued payment of Pensions to Participating Employees who are retired and are on Pension at the time of termination;

"(b) to provide retirement benefits to Participating Employees who are 65 years of age or older, and to employees less than 65 years of age who are Permanently Incapacitated, but who are not on Pensions at the time of such termination, at the time their employment with the Company is terminated, except that service after such termination shall not be deemed Credited Service in computing the amount of Pensions;

"(c) to credit all Participating Employees having fifteen or more years of continuous service at the time of such termination, with any and all of the further balance remaining in the fund in such amount, upon such terms and under such conditions as the Board shall determine to be equitable;

"(d) the allocations provided above may be accomplished through either (i) continuance of the Trust or a new Trust, or (ii) purchase of insurance annuity contracts or any combination thereof in the discretion of the Board;

tirement age (65) and not yet receiving benefits, are entitled to priority in payment of retirement benefits. Those with 15 or more years of continuous service, but not age 65 by the time of termination, are credited with all the further balance remaining in the fund " 'in such amount, upon such terms and under such conditions as the Board shall determine to be equitable.' " The allocations so provided are to be accomplished through either the continuance of the trust or the purchase of annuity contracts; however, the plan also states that: " [T]he board upon finding that it is not practical or desirable under the circumstances to do either of the foregoing with respect to any person or all of the persons included in the groups listed . . . may provide for allocation of a part or all of the Fund other than through the above methods. . . . ' "

The Fund was deemed "terminated" when the Plate Division Plant closed. Under the provisions of the plan, as outlined above, the Retirement Board,[2] which was charged with administering the plan, elected to continue the Fund. The Retirement Board, again under the provisions outlined above, concluded that only former employees who had at least 15 years service at the time the Plate Division closed, would receive pension benefits when they reached sixty years of age.[3]

Some six years after the Retirement Board had reached its conclusions concerning termination of the plan, suit was brought, on behalf of the former employees, requesting equitable relief mandating that the payments to be secured from the Fund be in the form of immediate lump sum outlays. The defendants to this action were Phoenix, the First Pennsylvania Trust Company, and the members of the Retirement Board. A second claim, asserted only against the USW, requested payment from the Union of an amount equal to that which would have been immediately forthcoming from the Fund had the Retirement Board chosen to distribute the Fund in the form of immediate lump sum payments, rather than continuing the Fund. On motion of the defendants, USW, Phoenix and Retirement Board, the district court granted summary judgment. From this decision, the employees appeal.

■ Appellants have raised three arguments. First, appellants call attention to that part of Section 17 which reads:

. . . provided, however, that the Board, upon finding that it is not practical or desirable under the circumstances to do either of the foregoing . . . may provide for allocation of part or all of the Fund other than through the above methods.

They argue that because of the hardship visited upon the employees by the loss of

provided, however, that the Board upon finding that it is not practicable or desirable under the circumstances to do either of the foregoing with respect to any person or all of the persons included in the groups listed above, may provide for allocation of part or all of the Fund other than through the above methods; provided, further, that no change shall be effected in the order of precedence and basis for allocation above established, nor shall any portion of the Fund be returnable to the Company.

"Decisions of the Board with respect to the allocation of the Fund upon termination of the Plan shall, in all respects, be conclusive and binding on

the parties hereto, and Trustees, the Participating Employees (including retired employees on Pension) and their respective beneficiaries, heirs, successors and assigns."

2. The Plan's funds were held by the First Pennsylvania Bank as trustee, but administered by the Retirement Board, which consisted of three members designated by the Company.

3. On March 5, 1971, Phoenix and the USW entered into a Supplemental Agreement which provided that Phoenix would make no further contributions to the Fund, but that no portion of the Fund would be returnable to Phoenix.

their jobs, the Retirement Board should have considered other approaches than the ones listed in Section 17. As the district court noted, the position of "the board and Union [was] that under the contract the pension trust had to be continued unless the fund was insufficient and, in their judgment, it was sufficient." The district court concluded that the interpretation of Section 17 given by the Retirement Board and Union was correct. We agree.

The purpose of the Pension Fund, as evinced by the agreement as a whole, was to create pensions. This goal lead to the establishment of the Fund in the first instance. Section 17 goes into considerable detail as to the manner of preference in which *pensions* are to be distributed in the event of termination of the Fund, and it states that its purpose is "to assure the continued payments of *Pensions* to Participating Employees." (emphasis supplied). Other sections of the Fund agreement also make clear that its sole purpose was the creation of pensions. Section 31, for example, provides that no participating employee has any "right, title, or interest in or to or claim against the Fund, or any part thereof except the right to receive *Pensions* in the amount and subject to the terms, conditions, and requirements in the plan." (emphasis supplied). Consonant with the stated purposes of the Fund, the most reasonable interpretation of that part of Section 17 cited by appellants is that the Retirement Board was only to consider other forms of distribution in the event the Fund was terminated before there were sufficient funds in it to create an adequate pension plan.

Appellants' second contention is that they were entitled to recover on a *quantum meruit* theory of recovery as against Phoenix. The gist of appellants' position is that they relied upon the pension plan as partial consideration for their continued services to the company, yet those employees who had not been employed for 15 years continuous service as of December 31, 1960, will receive nothing from the Fund. The direct answer to this argument is that those appellants who had not had fifteen years continuous employment, and who will not be receiving pensions, are barred from those benefits by the terms of the Pension Fund itself.[4] These terms were known to them when they became employees.

Additionally, appellants' cited authority for their position is not relevant to the instant case. Appellants rely on Lucas v. Seagrave, Corp., 277 F.Supp. 338 (D.Minn.1967). There, one company merged with another. Some employees were dismissed as a result of the merger. The pension plan, however, continued in operation. The court held that the dismissed employees were entitled to recover certain money from the pension fund. The critical fact upon which the district court rested its opinion was that the company was using the premiums, contributed by the dismissed employees, to meet *future* obligations owed by the company to the pension fund; yet, simultaneously, the company was denying pension benefits to those employees it had dismissed.[5] In the instant case, however, the pension fund is completely terminated. The company has no further obligations under the terms of the pension fund agreement. It will make no further payments into the plan, and receives no benefits from those who do not share under the termination provisions.

---

4. See note 1, supra.

5. The substance of the district court's holding in Lucas was that:
 "[W]here the substantial portion of a plan's participants are terminated and the employer benefits by *recapturing his contributions*, as well as by the years of employees' service at compensation less than the actual value of such service, it does not appear extreme or unfair to say that there may be a recovery on a quasi-contractual unjust enrichment theory. (footnote omitted; emphasis supplied).
 *Id.*, at 346.

The third and final argument raised here is that the USW should be held accountable because the evidence showed that the appellants acted in reliance on a USW promise that it would secure the pension benefits in the form of immediate lump sum payments. Appellants contend that they were injured by the USW's breach of this promise. This argument is predicated on the allegation that an official of the USW promised the employees that "they would receive immediate lump sum payouts of their pensions and that he would see to it that the Union secured such payments for them."

 The district court felt that even if such a statement had been made, it would have been unreasonable for the employees to have relied upon it, since the authority to determine the use of the Pension Fund rested solely with the Retirement Board. Thus, the district court concluded that there was "no genuine issue of material fact." Again, we agree. It was not necessary to know the Fund Agreement in any detail to know that the Board was vested with exclusive control of the disposition of the Fund on termination. This was basic and fundamental to the Fund agreement as a whole. As stated in Section 17:

> Decisions of the Board with respect to the allocation of the Fund upon termination of the Plan shall, in all respects be conclusive and binding.

and again in Section 20:

> . . . the Board shall have complete control and authority to determine the rights and benefits in respect of all claims, demands, actions, and other matters arising under the provisions of the Plan.

If, indeed, as appellants suggest, the Fund was an important part of their employment, it cannot reasonably be suggested that they would not have knowledge of the fact the Fund agreement had removed administration of the plan from USW control. Board control, not USW control, was critical to the structure of the plan as a whole. There-

fore, assuming that the Union in fact had promised the employees it would secure lump sum payments, reliance upon such a promise would be unreasonable.

For these reasons, the judgment of the district court will be affirmed.