Richard **LOVETRI** et al.

v.

**VICKERS, INCORPORATED** et al.

Civ. No. 12575.

United States District Court,
D. Connecticut.

June 11, 1975.

Norman Zolot, Hamden, Conn., for plaintiffs.

William J. Larkin 2d, Waterbury, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This suit against defendant, Sperry Rand Corporation, is brought by three of its former employees on behalf of the 270 non-salaried employees whose employment was terminated when the defendant's Waterbury Tool Division was closed on June 24, 1966. Plaintiffs' claims arise out of a contributory pension plan (*i. e.*, one to which both employee and employer contribute) that Sperry Rand maintains for its em-

ployees. The complaint was filed on May 24, 1968, and the case languished until March 9, 1973, when plaintiffs' motion to certify the suit as a class action was granted. After receiving notice, some thirty members of the class requested that they be excluded from the suit. On January 23, 1974, testimony was taken in the case, and the parties have since filed briefs. The action is finally presented for disposition on the merits.

The pension plan, in effect since 1941, is underwritten by John Hancock Mutual Life Insurance Co., pursuant to Contract No. 50 GAC. Part D of the contract covers the employees of the Waterbury Tool Division and the Wheeler Insulated Wire Co., Inc., as "Associated Employers" of Sperry Rand, the "Principal Employer" under the contract. In 1952 participation in the plan became a part of the collective bargaining agreement reached with the International Association of Machinists (I. A. M.) as collective bargaining agents for defendant's non-salaried employees. Each subsequent agreement between the two required continued particpation in the plan during the life of the agreement.

The I.A.M. continued as collective bargaining representative until June 16, 1965, when Teamsters Local 677 won an election ordered by the National Labor Relations Board because of irregularities in a 1964 election. After the 1965 election, defendant offered the Teamsters the same terms contained in an agreement reached with the I.A.M. subsequent to the voided election, but the Teamsters rejected the proposal. Further negotiations failed, and a strike was called in late 1965. On June 24, 1966, defendant notified the Teamsters and the employees that it was terminating manufacturing operations at the Waterbury plant. The defendant concedes that despite the change in bargaining representation, and despite the Teamsters' repu-

diation of the defendant's proposal to continue the I.A.M. agreement, the pension plan remained in effect.

In the notices of termination of employment sent by the defendant, each employee was required to elect "in lieu of all benefits otherwise payable under the . . . Contract," one of two options. Each employee whose rights in the plan had vested, i. e., who had made contributions under the plan for more than five years, could choose a cash payment in the full amount of his own contributions plus interest, or an annuity based both on his contributions to the plan and the employer's contributions on his behalf. All three named plaintiffs fell into this vested-rights category. To each employee whose rights had not vested, defendant offered a choice of cash payments or an annuity, both of which were limited to the employee's contributions alone. One hundred forty-nine employees, including the three named plaintiffs, elected to take the cash payment,[1] and 121 elected the pension.

Plaintiffs claim that every employee who was terminated when the plant closed was entitled to a more favorable choice of benefits. Specifically, they claim that every employee, whether or not his rights under the plan had vested and whether he chose an option that consisted of an annuity or an option that included cash, was entitled to receive an annuity based upon the employer's contributions. This would mean that the "annuity option" would be an annuity based on both employer and employee contributions. The "cash option" would be both the return in cash of the employee's contributions and an annuity based on the employer's contributions. For employees with vested rights, the claimed "annuity option" is what the company offered them; for employees without vested rights, the claimed "annuity option" would provide them an an-

---

1. Plaintiff D'Ambrosi originally made no election, and was therefore deemed to have chosen the annuity option. In February of 1968, however, he notified the John Hancock Company of his decision to take the cash payment instead.

nuity based on employer and employee contributions, instead of only on employee contributions, as the company offered. For employees with and without vested rights, the claimed "cash option" would add an annuity based on the employer's contributions, in addition to the cash return of the employee's contributions that the company offered.

In order to provide all of these employees with the value of the choice of benefits plaintiffs claim they should have been offered, different demands are made, depending upon whether the employees received the benefit of the employer's contributions. The only employees who received that benefit were those with vested rights who chose to take an annuity, *i. e.*, an annuity based on both employer and employee contributions. Under plaintiff's claim, these employees should have received an annuity based on employer contributions even if they chose the cash return of their own contributions. But the only way they were able to benefit from the employer's contributions was to elect an annuity, thereby taking the benefit of their own contributions in the form of an annuity, instead of the cash return they might have preferred. Plaintiffs therefore claim that these employees should now be given the right to receive a cash return of their employee contributions and forego that portion of their annuity based on their own contributions. All the other employees did not receive the benefit of the employer's contributions, either because they chose cash or because they had no vested rights and therefore the annuity they elected was based only on employee contributions. For these other employees, plaintiffs claim damages measured by the amount of the employer's contributions.

## I.

■ The defendant raises a number of barriers to an adjudication on the merits. Primarily it contends that because no collective bargaining agreement was in effect when the plaintiffs' employment was terminated, they cannot rely on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for jurisdiction. Of course the existence of a collective bargaining agreement is a predicate to § 301 jurisdiction, *Paterson Parchment Paper Co.* v. *International Brotherhood of Paper Makers,* 191 F.2d 252 (3d Cir. 1951), and in circumstances such as these, where the Teamsters repudiated the defendant's offer to continue the previous agreement and began a strike that ended only with the termination of operations at the plant, an extension of the previous agreement cannot be inferred, *Baker* v. *Fleet Maintenance, Inc.,* 409 F.2d 551 (7th Cir. 1969); *Procter & Gamble Independent Union* v. *Procter & Gamble Mfg. Co.,* 312 F.2d 181 (2d Cir. 1962).

■ The question of jurisdiction however, is not that simply resolved. In their brief, plaintiffs claim that their pension rights "arise both under the agreements prior to 1966 and the company's continuation of the plan during the negotiations." Presumably plaintiffs are asserting that § 301 jurisdiction exists over the former claim and invoking pendent jurisdiction over the latter. Defendant maintains that because the events of which plaintiffs complain occurred after the last agreement expired, any rights plaintiffs have arise under the pension plan alone.

The last collective bargaining agreement between the defendant and the I. A. M. took effect on August 13, 1964. It provided, as did all their agreements dating back to 1952, that "the Company agrees to continue the retirement pension benefits as modified and [then] in effect . . . ." The plaintiffs were all employed while this and previous collective bargaining agreements were in force. During that time they made contributions to the pension plan, and defendant made contributions on their behalf. While the alleged breach admittedly occurred after the final collective bargaining agreement lapsed, and while the employees continued to work without an agreement, plaintiffs claim

that because they were denied some rights that arose by reason of their employment under a collective bargaining contract, § 301 will provide jurisdiction for their suit. Whether such circumstances give rise to a claim under § 301 is a close question. In view of the considerable length of time this case has been pending, and the inadequacy of the claim on the merits, the Court believes it is appropriate to assume jurisdiction and render a final adjudication of this case.[2]

■ Defendant also asserts that the named plaintiffs are estopped from making their claims because "each voluntarily elected the option of receiving a cash payment, rather than a paid-up deferred annuity . . . ." Defendant's brief does not clarify the nature of this estoppel claim. Plaintiffs, however, cannot be estopped because they took cash "in lieu of" their pension benefits. They were not offered the cash as a liquidation of a disputed right, *Fleming* v. *Post*, 146 F.2d 441 (2d Cir. 1944), or as a part of a plant closing agreement intended to supersede the pension plan and their rights thereunder, *cf. Craig* v. *Bemis Co., Inc.*, 374 F.Supp. 1251 (S.D. Ala.1974). Whatever the language used in the notice of termination of employment, plaintiffs were offered what defendant even now maintains were their rightful options under the pension plan. They did not forfeit the right to challenge the adequacy of the choice simply because they elected one or the other of the options they were given.

■ Nor can this suit be characterized as a claim to an option the named plaintiffs have already chosen to forego. As participants with vested rights in the plan, all three named plaintiffs were offered a pension based on both employee and employer contributions. They chose instead to take a cash payment based only on their own contributions, and thereby gave up a benefit based, as they claim all benefits for the class should be, on employer contributions as well. Their choice of a particular option, however, does not preclude them from asserting a right to be given a different set of options than the ones they were actually offered, and they are not thereby estopped from bringing this suit.

## II.

On the merits of their suit, plaintiffs present three separate claims. First, they argue that the closing of the Waterbury plant effected a partial termination of the pension plan, which, according to the plan's own provisions, required defendant to offer the options plaintiffs demand. Second, plaintiffs allege the occurrence of a partial termination of the plan within the meaning of Internal Revenue Code § 401, 26 U.S.C. § 401, which, they maintain, also requires defendant to make employer contributions a part of both options. Finally, plaintiffs argue that if the plan itself does not give them the benefit of employer contributions made in their behalf, then the equitable principle of *quantum meruit* does.

### A.

Plaintiffs base their first claim on § 6(B) of Article IV of the pension contract. That provision establishes the benefits to which employees are entitled when their employment is terminated subsequent to a discontinuance of annuity purchases "in accordance with Section 6 of Article III." Should termination follow such a discontinuance, an employee is entitled to an annuity based on

---

2. Plaintiffs also assert jurisdiction on the basis of diversity of citizenship, 28 U.S.C. § 1332. While no individual claim exceeds $10,000, plaintiffs apparently assume that their claims can be aggregated for purposes of meeting § 1332's jurisdictional amount. While there is substantial doubt that aggregation is appropriate in the context of this case, *cf. Snyder* v. *Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the assumption of jurisdiction under 29 U.S.C. § 185 makes it unnecessary to reach this question.

employer contributions made on his behalf, whether or not his rights under the plan have vested, and whether he chooses to receive the benefit of his own contributions in the form of a cash payment or an annuity.

Section 6(A) of Article IV provides those options that terminated employees must be offered when there has been no discontinuance of purchases. Upon termination of their employment, all members of plaintiffs' class were offered the 6(A) options. Only those employees whose pension rights had already vested were offered the benefit of employer contributions, and then only if they chose to accept the return of their own contributions in the form of annuities.

The question is what meaning should be accorded to the term "discontinuance of retirement annuity purchases," the event that triggers the 6(B) options if employees are thereafter terminated. Section 6 of Article III provides, *inter alia*, that

> The purchase of Retirement Annuities under this Part shall be discontinued on and after the Consideration due date specified in a written notice which may be given
>
>> (i) by the Employer to the [underwriter] that payment of considerations under this Part shall be discontinued as of such date . . . provided such notice is received by the [underwriter] at its Home Office prior to such date . . . .

Defendant could discontinue purchases either on behalf of all the employees covered by the plan, or on behalf of only those employed by an "Associated Employer," such as the Waterbury Tool Division. Plaintiffs maintain that the closing of the plant caused a discontinuance of purchases, within the meaning of the contract, that entitled all employees at the Waterbury plant to the options set out in § 6(B) of Article IV. Defendant claims that the closing did not constitute a discontinuance, so that in offering the terminated employees the

options provided by § 6(A), it fulfilled its obligations under the contract.

*Hudson* v. *John Hancock Mutual Life Ins. Co.*, 314 F.2d 16 (8th Cir. 1963), involved a similar pension plan that had also been issued by John Hancock. In that case, employees, fired when they struck in violation of their collective bargaining agreement, sought the benefit of employer contributions previously made in their behalf. While all operations had ceased and all other employees had been terminated before the suit was brought, the Court found that "termination of the appellant-employees [those who went out on strike] clearly took place before, not after, any conceivable discontinuance," 314 F.2d at 23. Noting that "discontinuance" had a "definite contractual meaning," 314 F.2d at 24, the Court held that the mass firing of the striking employees did not constitute such an event.

Plaintiffs would distinguish *Hudson* because that case involved the firing of individual employees rather than the closing of an entire plant. That distinction, however, does not call for a different result. Neither the firing of individual striking employees nor the termination of all the employees of a shutdown plant falls within the "definite contractual meaning" of a discontinuance of annuity purchases. That provision enables the employer to end the participation of his employees in the pension plan, even though his business continues with a full complement of workers: it contemplates the termination of the plan, not the plant. Employees who are terminated, in whatever numbers and for whatever reasons, may not claim that their termination itself effects such a discontinuance. See also *Gorr* v. *Consolidated Foods*, 253 Minn. 375, 91 N.W.2d 772 (1958).

Plaintiffs point to the treatment accorded under the plan to employees who are temporarily laid off. As to such employees, § 5 of Article III allows the employer to "suspend" the purchase of

annuities for renewable periods of up to one year. Such a suspension, of course, does not trigger the end of an employee's participation in the plan, but only interrupts for a time the employer's obligation to make contributions on his behalf. Should the employer choose to discontinue purchase of annuities while such a suspension is still in effect, its employees are entitled to the increased benefits that accrue because of the discontinuance, notwithstanding the suspension of their participation in the plan. Such treatment argues against and not for plaintiffs' interpretation of the contract, for it too demonstrates that the plan's provisions for discontinuance of annuity purchases were intended only to permit the employer to close out participation in the pension plan, while company operations continue.[3]

In this case, plaintiffs and all other members of their bargaining unit were sent notices of termination of employment, effective June 21, 1966. Defendant, however, did not discontinue annuity purchases at that point.[4] A number of other employees, not members of the bargaining unit, continued to work at the plant and participated in the pension plan. The last contributions on behalf of those employees were made in June,

1967, based on the May payroll. On April 25, 1968, the plan was amended retroactive to June 1, 1967, to terminate the status of the Waterbury Tool Division as an Associated Employer. Even if this amendment marked a discontinuance of annuity purchases within the meaning of Article III, § 6, it came long after the termination of plaintiffs' employment. Therefore, they are entitled under the explicit terms of the pension contract only to the choice of benefits they were in fact offered.

### B.

Plaintiffs' second argument is based on the plan's status as a "qualified plan" within the meaning of 26 U.S.C. § 401. They claim that since defendant applied for and received the tax benefits accorded to a "qualified plan," it is thereby bound by the provisions of § 401 and the regulations issued pursuant to it, "as fully as though those terms were embodied in the contract." In order to qualify for § 401 treatment, a plan must provide that upon its partial or complete termination, or upon the discontinuance of contributions,

> the rights of each employee to benefits accrued to the date of such termination or discontinuance, to the extent

3. Paragraph 7 of Article III, § 6, is also consistent with this narrow reading of "discontinuance." It provides, *inter alia*, that Unless discontinuance of Retirement Annuity purchases under this Part occurs in accordance with the [provision concerning discontinuance of annuity purchases], the liquidation, dissolution, bankruptcy or receivership of the Principle Employer or any Associated Employer shall not of itself result in the discontinuance of Retirement Annuity purchases, but . . . in the event the Effective Date of Termination of Employment of an employee of an Associated Employer is on or after the date of liquidation, dissolution, bankruptcy or receivership of such Associated Employer, Section 6 . . . of Article IV shall be applicable to such employee in the same manner as [it] would have been if discontinuance of Retirement Annuity purchases had occurred.

This provision, too, establishes the rights of employees who, despite the "liquidation, dis-

solution, bankruptcy, or receivership" of the Employer or Associated Employer, remain in its employ. Because it is triggered by the alteration of the corporate status of either the Principle Employer or an Associated Employer, this paragraph has no relation to the closing of the Waterbury Tool Division, which had no separate corporate existence apart from Sperry Rand. Plaintiffs, in any case, make no claim that the Waterbury Tool Division was either "liquidated" or "dissolved" prior to or on the effective date of their termination.

4. The notice of termination sent plaintiff Middendorf set October 25, 1965, as his termination date. While there is no explanation of why his employment terminated earlier than that of his fellow employees, that fact has no bearing on this case. All members of the bargaining unit were terminated prior to any event that can be considered a discontinuance of annuity purchases.

then funded, or the rights of each employee to the amounts credited to his account at such time, are nonforfeitable. 26 C.F.R. § 1.401–6(a).

The regulations specify that a plan is terminated "when, in connection with the winding up of the employer's trade or business, the employer begins to discharge his employees." 26 C.F.R. § 1.-401–6(b)(1).

Plaintiffs claim that the closing of the Waterbury plant caused a partial termination of its pension plan within the meaning of these regulations, but apparently not every plant closing effects a partial termination of the pension plan of its employees. Both plaintiffs and defendant point to Revenue Rulings in which the Internal Revenue Service found partial terminations in closings that resulted in the discharge of more than 50% of a plan's participating employees, Rev.Rul. 72–510; 72–328. These rulings suggest that partial termination occurs only when a "significant number" or a "significant percentage" of employees are affected by a closing, but give little content to the term "substantial" and leave unclear whether percentages or absolute numbers are controlling.

Plaintiffs claim that because the Waterbury plant was one of only two operations whose employees were covered by Part D of Contract No. 50 GAC, its closing was clearly a partial termination as judged by the criteria established in these rulings. Defendant views the situation from a different perspective. It sees the closing as a discharge of only a small fraction of the 19,206 Sperry Rand employees covered by all parts of the pension contract, which it argues cannot constitute a partial termination of the plan. That defendant's analysis is the better one is suggested by the plan's treatment of the credit defendant received for the employer contributions made

on behalf of the terminated employees. Such credit could be applied not only to defendant's future obligations on behalf of those employees still covered by Part D of the contract, but to future payments due on behalf of all Sperry Rand employees covered by any part of the plan. The division of the contract into parts, then, was in all probability intended only as an administrative convenience, and not as the creation of several independent plans.

█ It is not necessary, however, to determine either the meaning of the tax regulations or their application to the closing of the Waterbury plant, for there is substantial authority that "the tax provisions are relevant only to the tax status of the plan," *Lucas* v. *Seagrave Corp.*, 277 F.Supp. 338, 342 (D. Minn.1967). Only if the tax regulations are actually incorporated into the contract may plaintiffs claim rights based on their provisions, *id.; Langer* v. *Iowa Beef Packers, Inc.*, 420 F.2d 365 (8th Cir. 1970). See also *Rothlein* v. *Armour & Co.*, 377 F.Supp. 506 (W.D.Pa. 1974); *Barlow v. Marriot Corp.*, 328 F. Supp. 624 (D.Md.1971).[5] While various amendments to the contract envisioned occasional modifications "for the purposes of conforming this contract under Section 401 of the Internal Revenue Code," at no time did the contract itself incorporate either § 401 or the related regulations in its terms. Whatever the plan's status under those tax provisions, plaintiffs may make no claims for benefits based on their requirements.

### C.

Plaintiffs' final argument invokes the equitable doctrine of *quantum meruit*. They begin with the observation that employer contributions previously made on behalf of a terminated employee represent some part of the compensation paid for his work. As defendant can now

---

5. In *Hudson* v. *John Hancock Mutual Life Ins. Co., supra*, the Court did look to the tax regulations in determining employee rights under a "qualified" pension plan, but found that the plan remained qualified despite the actions that plaintiffs challenged.

If this decision established the proposition that employees may claim pension rights based on the related tax provisions, it was subsequently abandoned by the Eighth Circuit in *Langer* v. *Iowa Beef Packers, Inc., supra.*

credit these contributions to its obligations on behalf of other employees, plaintiffs argue that defendant has thereby received the benefit of some portion of the employee's work at no cost. According to this theory, defendant is unjustly enriched, and owes the employee the value of that part of his work for which the employer contributions were to compensate.

■ By its very nature, this claim, even if valid, does not arise out of a collective bargaining contract. Each employee seeks only a return for his own labor, though measuring its value by employer contributions to a pension plan that was arguably a part of a collective agreement. While § 301 provides no independent jurisdiction to hear such a claim, plaintiffs do make other claims for which § 301 jurisdiction has been assumed. Since all their claims arise out of "a common nucleus of operative fact," *United Mine Workers* v. *Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), this Court can take pendent jurisdiction of the *quantum meruit* claim even if the federal claim is without merit, *Knoll* v. *Phoenix Steel Corp.*, 325 F.Supp. 666, 670 (E.D. Pa.1971), *aff'd*, 465 F.2d 1128 (3d Cir. 1972).

■■ Plaintiffs argue that by closing the Waterbury plant and terminating their employment, defendant made it impossible for them to fulfill the conditions that would entitle them to annuities based on the employer contributions. Unless a contract provides otherwise, should its performance become impossible, the promisee must repay the value of the benefit conferred on him by the partial performance of the promisor. *Automobile Ins. Co.* v. *Model Family Laundries, Inc.*, 133 Conn. 433, 52 A.2d

137 (1947); *Restatement of Contracts* § 468. Defendant, however, did not promise that plaintiffs would remain in defendant's employ until retirement, thereby becoming entitled to the annuity; it promised the annuity only if they actually remained employed until retirement. Plaintiffs, in other words, were not paid for their labor with an annuity, but only with the chance of receiving one should certain conditions be fulfilled.

It remains unclear, though, just what "gamble" the plaintiffs took. Of course, had an individual employee been terminated prior to his retirement, no *quantum meruit* recovery would be available to him. That would be the case both because the contract explicitly covered such a contingency, and because the possibility of such a termination was a risk the employee assumed in accepting a contingent annuity benefit, see 6 Williston, *Contracts*, § 1972A.

One commentator in this field suggests that while employees do assume the risk of "layoff and separation in the normal course of business," that may not encompass "wholesale job loss accompanying mergers and plant and unit shutdowns," Bernstein, *Employee Pension Rights When Plants Shut Down: Problems and Some Proposals*, 76 Harv. L.R. 952, 967 (1963). Because actuaries make no explicit assumptions about plant shutdown, and because turnover rates are based on large employee populations that are unlikely to reflect the actual impact of shutdowns on an individual employer, Bernstein notes that the turnover resulting from the closing of "relatively large units" will probably exceed the rate assumed by an actuary in assessing the overall cost of a pension plan.[6] He argues that where this under-

---

6. As Bernstein admits, the cost of an annuity premium does not reflect a "discount" for employee turnover. Because the employer receives credit for the contributions it previously made on behalf of terminated employees, the underwriter can offer the employer no better rate per employee covered because of an expectation that some number of employees will never reach retirement age while still in the company's employ. How-

ever, if the employer could foresee the possibility of a plant closing, it might be willing to purchase larger benefits for all its employees on the chance that such a closing would occur and thereby remove a large number of its employees from participation in the plan. Ironically enough, the larger annuity would benefit only those employees who remained after the plant closing, and would have no effect on those, like plaintiffs

estimation occurs, a court should conclude that the employer did not "count upon" the reduced cost and the employees did not risk the termination that accompanied the closing, *id.*, 76 Harv.L. R. at 970.

Courts faced with the question, though, have been reluctant to omit plant closings from the contingencies contemplated in provisions made for employees terminated prior to their retirement. In *Knoll* v. *Phoenix Steel Corp., supra,* the Court held that by establishing the tenure requirements for the vesting of pension rights, the explicit terms of the contract barred any *quantum meruit* claim arising out of a plant closing, 465 F.2d at 1131. In *Schneider* v. *McKesson & Robbins, Inc.,* 254 F.2d 827 (2d Cir. 1958), a case decided prior to the appearance of the Bernstein article, the Court of Appeals held the closing of a sales office to be a "normal incident" of the defendant's business, and not a partial termination of its pension plan. When faced with a request for equitable relief, the Court declined to "twist the Plan into something it clearly is not." 254 F.2d at 830. See also *Gorr* v. *Consolidated Foods, supra.*

These same courts have also been reluctant to differentiate between plant closings and individual terminations in assessing the risks employees take in accepting contingent annuity benefits. *Knoll* v. *Phoenix Steel Corp., supra,* ignored actuarial considerations entirely, and observed only that the terms of the contract (which it assumed governed a plant closing), "were known to [plaintiffs] when they became employees," 465 F.2d at 1131. *Schneider* v. *McKesson & Robbins, Inc., supra,* observed that

> under the plan, and in practice, the amount of the employer's contributions have been determined in accordance with an actuarial formula which

takes into account that any employee who does not continue his employment with the company until retirement age is not entitled to any benefits under the plan. 254 F.2d at 830.

In assessing the *Schneider* decision, Bernstein conceded that the number and percentage of terminated employees in that case (1.6% of the total participating) were so small, "as to make it dubious that one could measure whether turnover exceeded the expected." 76 Harv.L.R. at 976.

*Lucas* v. *Seagrave Corp., supra,* relied on the Bernstein article in denying a motion to dismiss a *quantum meruit* claim to the contributions made by an employer to its unilaterally established pension plan. Accepting Bernstein's actuarial assumptions, the Court thought it

> harsh to assert that employees assume knowingly the risk of all contingencies which might prevent their recovery of benefits; as if the plan were a negotiated contract agreed upon through arm's length bargaining. 277 F.Supp. at 346.

Recognizing the availability of a *quantum meruit* recovery in some cases of mass termination, the Court held that parol evidence was necessary to determine whether the particular events in that case were ones contemplated by the contract. See also *Fredericks* v. *Georgia-Pacific Corp.,* 331 F.Supp. 422 (E. D.Pa.1971), *appeal dismissed,* 474 F.2d 1338 (3d Cir. 1972).

Plaintiffs rely heavily on *Lucas* in making their claim, but that case differs from this one in several important respects. First, this plan was, at least to some extent, the subject of collective bargaining, which makes strict adherence to the terms of the pension contract less inequitable than it was in *Lucas.*[7]

---

here, who were discharged when the plant closed.

**7.** As the deposition of plaintiff Lovetri indicates, the I.A.M. was unable to effect any changes in the terms of the pension plan, and received only a promise to continue the

plan during the life of each collective bargaining agreement. Lovetri testified:

That's the best we could get out of them. That's why it was there. They always said they couldn't go any further. They said that it was a Sperry Rand pension plan and they were not about to negotiate

Second, in *Lucas* plaintiffs alleged that a group of employees were either discharged or pressured into resigning "pursuant to an intent to ultimately terminate the plan" after the credits received by reason of the terminations were exhausted. The Court relied on the allegation of "bad faith" in requiring trial of plaintiffs' equitable claim, 277 F.Supp. at 346, and one court has distinguished *Lucas* for lack of such an allegation, *Rothlein* v. *Armour and Co., supra,* 377 F.Supp. at 511. *Cf. Fredericks* v. *Georgia-Pacific Corp., supra.* Here, too, plaintiffs make no claim that the plant was closed in order to deprive them of the opportunity to earn the pension benefits to which they would have been entitled upon their retirement, or that the closing was anything other than an economic decision brought on by the Teamsters' strike.

Finally, plaintiffs have made no showing that the actuarial considerations that underlie both the Bernstein article and *Lucas* are applicable to this case. Since 30 of a total of 65 participating employees were terminated in *Lucas,* that Court understandably relied on Bernstein's statistical observations, but even he admits that his analysis has "dubious" application to a plant closing as small—in percentage terms—as that in *Schneider, supra.* And when judged by the number of all employees participating in the Sperry plan, the closing of the Waterbury plant had an even smaller percentage effect. Its shutdown resulted in the termination of 270 employees, less than 1.5% of the 19,206 covered under Contract No. 50 GAC.

While plaintiffs might claim here, too, that the closing should be viewed as the shutdown of one of only two operations covered by Part D of the contract, there can be no question that in this context the closing must be viewed in light of its effect on the entire plan. Because the credit defendant receives by reason of employee terminations may be used to satisfy its obligations on behalf of Sperry Rand employees participating in all parts of the plan, any actuarial estimate of pension costs can be made only for the entire plan, and not just for its constituent parts. Viewed from this perspective, and even accepting Bernstein's thesis, it is unlikely that the terminations resulting from the Waterbury closing were "unexpected" within the meaning of plaintiffs' *quantum meruit* claim. Plaintiffs have offered no actuarial evidence to the contrary.

There is no reason, then, to depart from the explicit terms of the contract. Since plaintiffs' employment was not terminated on or after any discontinuance of annuity purchases, they are not entitled to the benefits meant only for those who were. Moreover, plaintiffs have failed to demonstrate, by actuarial evidence or otherwise, that the Waterbury employees did not assume the risk that a plant closing would preclude them from continued employment until their retirement.

Neither the contract, the Internal Revenue regulations, nor any equitable considerations entitle plaintiffs to the benefit of the employer contributions made on their behalf. Because they have received all that the contract provides for employees who are terminated during the life of the pension plan, their complaint is accordingly dismissed on the merits, and judgment may enter for defendant.[8]

a separate pension plan for the [Waterbury] plant. Deposition of Richard Lovetri, p. 9. That the I.A.M. was not able to achieve more in its negotiations with defendant does not alter the fact that the plan was a subject of collective bargaining. In any case, plaintiffs could not (and do not) claim that the collective bargaining agreements provide the basis of jurisdiction for a suit over pension rights, but that, for the purpose of deciding the merits of the case, the pension plan should be treated as if it were unilaterally imposed by the employer.

8. The reference to defendant Sperry Rand Corporation, which is the principal defendant in this case, should be understood to include defendant Vickers, Incorporated, which has been merged into Sperry Rand Corporation.