**UNITED STEELWORKERS
OF AMERICA**

v.

**CRANE COMPANY and its subsidiary,
Acheson Manufacturing
Company, Appellants.**

No. 78–2541.

United States Court of Appeals,
Third Circuit.

Argued July 9, 1979.

Decided Sept. 19, 1979.

Louis Emanuel, III, John J. McLean, Jr. (argued), R. A. King, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellants.

William H. Schmelling (argued), Asst. Gen. Counsel, United Steelworkers of America, Chicago, Ill., for appellee; Bernard Kleiman, Gen. Counsel, United Steelworkers of America, Chicago, Ill., of counsel.

Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In this case we must examine, under certain collective bargaining agreements, the extent of an employer's obligations for its employees' pensions, when the employer has closed its plant and terminated the pension plan. The United Steelworkers of America ("Union") brought suit under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), upon two claims: (1) that the Crane Company was reneging on its duty to pay for a particular class of pensions; and (2) that the company had paid less than its required contributions to the pension fund. The district court rendered judgment for the Union on both claims. On appeal by the company, we reverse in part and affirm in part.

### I.

Commencing sometime prior to 1950, the Union represented certain employees at a Pennsylvania factory of the Acheson Manufacturing Co., which later became a subsidiary of the Crane Company (collectively, the "employer" or "Crane").[1]

In 1950 the employer and Union established a pension plan. Article VII, section 2(B), of this plan limited the employer's liability for pension benefits:

---

1. Until 1966, the plant was owned by Acheson Manufacturing Co., a Pennsylvania corporation. In 1966 Crane bought Acheson, and in 1969 Acheson's assets were transferred to Crane. In 1971 Crane reconveyed the assets to a Delaware corporation, also known as Acheson Manufacturing Co. The Delaware corporation and Crane are the defendants in this suit, but it is not disputed that these defendants have assumed the liabilities of the Pennsylvania corporation.

The Pension benefits of the plan shall be only such as can be provided by the assets of the pension fund or by any insured fund, and there shall be no liability or obligation on the part of the Company to make any further contributions to the trustee or insurance company in the event of termination of the Plan. No liability for the payment of pension benefits under the plan shall be imposed upon the Company, the officers, directors or stockholders of the Company.

The 1950 Pension Plan provided for two classes of benefits: payments for former employees reaching 65 years of age and having 15 years of experience, and for incapacitated former employees having 15 years of experience.

A collective bargaining agreement signed in 1957 created the "deferred vested pension," which is at issue in this suit. The following provision for deferred vested pensions was carried forward without change in subsequent collective bargaining agreements, appearing as section 18(B)(4)(a) in the 1959, 1961, 1966, and 1969 contracts.

Notwithstanding any other provision of the Pension Plan, any employee who shall be laid off and not recalled within two years, or whose employment shall be terminated as a result of a permanent shutdown of the plant, department or subdivision thereof, and who at the end of two years or the date of his termination shall have reached his fortieth birthday and at such time shall have 15 or more years of continuous service, shall be eligible, upon making application therefor as specified herein, to receive a deferred vested retirement pension.

This pension was "deferred" in that the former employee with 15 years of continuous service would not be eligible for benefits until age 65, even though he might be discharged as early as age 40.

At the time of the 1957 Collective Bargaining Agreement, the 1950 Pension Plan had not been revised to reflect the creation of deferred vested pensions. Through amendments to the Pension Plan in 1962, the Union and the employer corrected this omission. The amended Pension Plan recognized deferred vested pensions, as well as other types of benefits not included in the 1950 Plan. Listing the priority of claims that might be made against the pension fund upon termination of the plan, the 1962 amendments placed the deferred vested pensions fifth. The amendments also incorporated, as section VII(C), a limitation of the employer's liability:

Neither the Trustee nor the Company nor the Pension Board, either as a board or as individuals, in any manner guarantees the Trustee fund from loss or depreciation. All payments of pensions as provided in this Plan shall be made solely out of the Trust Fund, and there shall be no liability on the part of the Company to make further contributions to the Trustee in event of termination of the Plan. Neither the trustee nor the Company nor the Pension Board, either as a Board or as individuals, shall be in any manner liable for the payment of pension benefits under the Plan.

Treating the employer's obligation to pay into a pension fund established to support all types of pensions, section VII(A) of the amended Pension Plan required the employer to contribute amounts "sufficient on a sound actuarial basis to fund future service costs each year and to fund the lump sum past service cost at a rate not less than one twenty-fifth ($\frac{1}{25}$th) annually." "Past service costs" referred to the liability for benefits earned by virtue of employment before the pensions were created. An increase in benefits would also give rise to past service costs based on service rendered after creation of the pensions but before the increase. Another provision pertaining to the employer's contribution appeared as section 18(B)(7)(c) in the 1959, 1961, 1966, and 1969 Collective Bargaining Agreements:

The actuarily [sic] determined past service funding liability applicable to earned prior pension credits determined by application of Article 7, section b. shall be paid at the rate of one-twenty fifth [sic] ($\frac{1}{25}$) annually or one three hundredths ($\frac{1}{300}$) each month during the continuation of this Agreement.

In 1972 Crane permanently closed the Acheson plant at Braddock, Pennsylvania, and discharged the employees, who were represented by the Union. The pension plan program was terminated. A "Memorandum of Agreement" between the employer and Union guaranteed that employees who qualified under section 18(B)(4) of the Collective Bargaining Agreement would be "eligible" for deferred vested pensions, according to the terms of that section.

The pension fund, although sufficient for the retirement and disability pensions, did not contain adequate assets to cover the entire amount for the deferred vested pensions. Invoking section VII(C) of the Pension Plan, which concerned the limits of liability, the employer disclaimed any financial responsibility beyond the contributions it had already made to the fund. Approximately 110 employees who would have received deferred vested pensions at age 65 were thus left without full benefits.

After a bench trial, the district court rendered a judgment in favor of the Union. The court held that despite the exculpatory clause of the Pension Plan, the employer's liability was not confined to contributions already made to the pension fund. The court ruled that Crane had independently guaranteed payment of the deferred vested pensions. In reaching this conclusion, the court noted the opening phrase of section 18(B)(4)(a), *supra,* at 716, in the Collective Bargaining Agreement: "Notwithstanding any other provision of the Pension Plan . . . ." The district court interpreted this phrase to nullify the exculpatory clause's application to deferred vested pensions. Because the pensions were said to be "vested," the district court decided that Crane had guaranteed payment of all the benefits.

Having sustained the Union's argument about Crane's independent liability, the court turned to the provisions concerning the employer's contributions to the pension fund. The Union and the employer disputed whether the employer had met its obligations for the years 1967 to 1972. As the Union read section VII(A) of the Pension Plan and section 18(B)(7)(c) of the Collective Bargaining Agreement, Crane had been obligated to make contributions sufficient to amortize in 25 years the past service costs of the fund. The employer, on the other hand, urged that its obligation had been to contribute four percent of the past service cost existing each year. Because interest had been accruing on the obligations to employees by virtue of past service, this four percent contribution fell considerably short of the amount that would have been required to amortize the past service costs in 25 years. Accepting the Union's interpretation, the district court reasoned that a greater obligation to make contributions would better accord with the employer's guarantee to pay the deferred vested pensions. The Union and Crane have stipulated that if the company had to pay enough to amortize the past service costs, it would owe the pension fund $199,-884, as of January 1, 1978.

## II.

This case illustrates one of the problems that led Congress in 1974 to enact the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1976). To protect employees' expectations of benefits, that statute set up a system of "plan termination insurance." 29 U.S.C. §§ 1301–1381 (1976). Congress intended to prevent the loss of benefits under plans that, upon termination, contained insufficient funds. *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947, 951 (7th Cir. 1979), *cert. granted,* —— U.S. ——, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979). But because this system of insurance does not cover plans that were terminated before September 2, 1974, ERISA does not apply here. We are constrained to look only to the agreements that the Union and the employer concluded, and if these contracts leave the employees unprotected, we are required, reluctant as we may be, to enforce the contractual terms to which the parties have agreed. *See, e.g., Dwyer v. Climatrol Industries, Inc.,* 544 F.2d 307, 310 (7th Cir. 1976), *cert. denied,* 430 U.S. 932, 97 S.Ct.

1553, 51 L.Ed.2d 776 (1977) (employees suing union and company unprotected when contract reserved right of modification); *International Union of United Brewery Flour, Cereal, Soft Drink & Distillery Workers v. Duke & Co.*, 373 F.Supp. 778, 786 (W.D.Pa.1974), *aff'd mem.*, 510 F.2d 969 (3d Cir. 1975).

■ The district court held that the employer had guaranteed the payment of the deferred vested pensions and that the employer's obligation was independent of any duty to contribute to the pension fund and independent of the fund's liability to the employees. This ruling rested upon an interpretation of section 18(B)(4)(a) of the Collective Bargaining Agreement, which is reproduced *supra.*

Section 18(B)(4)(a) declares that, upon closure of the plant, any employee who is at least 40 years old and has 15 years of continuous service shall be "eligible . . . to receive a deferred vested retirement pension." The Union urges that because the employees' rights are "vested," Crane has promised to pay the pensions. This argument, however, does not square with the language of the Collective Bargaining Agreements. Section 18(B)(4)(a) only makes employees "eligible" for pensions, and "eligibility" does not guarantee payment from any source. In particular, this provision for eligibility does not expressly create any right against the employer.

Nor does the Memorandum of Agreement signed in 1972 enlarge the protection to the employees. That instrument only confirms the eligibility established by section 18(B)(4)(a) of the Collective Bargaining Agreement. The Memorandum declares that persons qualifying under section 18(B)(4) "shall be *eligible* for such pensions as they are entitled to in accordance with the provisions of said section . . . ." (Emphasis supplied.)

To refute these arguments, the Union offers an alternative interpretation of the purposes behind the word "eligible." According to the Union, former employees may become "eligible" for a deferred vested pension as early as age 40, but none may receive such a pension until age 65. In using the word "eligible," the parties did not contemplate, in the Union's view, that a former employee might have only a claim to payment and not a guarantee. They instead had in mind that some former employees, despite being over 40 and having 15 years continuous service, would be required to wait for benefits until they reached 65 years of age. Only these former employees who had not yet become 65 would be merely "eligible." Those over 65 would hold a guarantee of immediate payment. Section 18(B)(4)(a), by the Union's interpretation, adopted the word "eligible" to denote that certain former employees, from as early as age 40, had a right to the future, rather than the immediate, payment of benefits.

The Union presented no evidence that the parties actually intended "eligible" to reflect this purpose. Moreover, the Union's explanation does not accord with the language used. Section 18(B)(4)(a) declares that former employees who are over 40 and have 15 years of continuous service "shall be eligible, *upon making application therefor as specified herein,* to receive a deferred vested retirement pension." (Emphasis supplied.) A proper application is thus a condition of eligibility. According to section 18(B)(4)(c), a former employee can apply for a deferred vested pension no earlier than 90 days before his sixty-fifth birthday and no later than his seventieth birthday. A former employee cannot become "eligible," therefore, until he is nearly 65 and not, as the Union argues, when he is as young as 40. The word "eligible" could not have been intended to clarify the rights of employees during a period potentially as long as the time between age 40 and age 65. Logically, the Union's argument might instead have been tied to the period between an application (as early as 90 days before the sixty-fifth birthday) and the date when benefits are payable (in the month after the month of the sixty-fifth birthday): during this time, by analogy with the Union's argument, a former employee might be "eligible" without having a right to immediate payment. But the Union does not contend

that the word was intended to refer specifically to that period.

In addition to the word "eligible" in the Collective Bargaining Agreement, two provisions of the Pension Plan bear on the question whether Crane has an independent obligation to pay the deferred vested pensions. First, in section VII(C), the Pension Plan absolves the employer of any liability other than its obligation to contribute to the pension fund. Second, the Plan dictates the priority of claims against the fund, putting deferred vested pensions behind other pensions that are admittedly unguaranteed. It would be anomalous for the employer to guarantee a form of pension that had a lower priority than other pension categories whose payments concededly are not guaranteed.

The Union disputes the applicability of these provisions to section 18(B)(4)(a) of the Collective Bargaining Agreement. The section begins with this phrase: "Notwithstanding any other provision of the pension plan . . . ." In the Union's view, this phrase nullifies the provision concerning the limits of the employer's liability and negates the implication of the priority among claims against the pension fund. Our conclusion about the meaning of "eligible," however, contradicts this argument. At the most,[2] the "notwithstanding" phrase of section 18(B)(4)(a) would cut off the application of any provisions from the Pension Plan that conflicted with that section of the Collective Bargaining Agreement. But because the word "eligible" shows that the section does not guarantee payment of pension claims, the provisions from the Pension Plan do not conflict with section 18(B)(4)(a). They rather clarify and supplement that section. They reinforce the conclusion that Crane is not a guarantor of the deferred vested pensions.

We deeply deplore the hardships that will be suffered by employees who planned upon the receipt of their full deferred vested pensions, but we may not substitute our sympathies for the considered agreement of the parties. Because the Union and Crane did not conclude a bargain for the employer's guarantee of the deferred vested pensions, we reverse the district court's conclusion on this point.

## III.

■ Even if Crane's contractual obligation is limited to its duty of contributing to the pension fund, the Union contends that the employer has paid less to the fund than the agreements between the parties required. The district court ruled for the Union on this point, concluding that increased contributions by Crane to the fund would be in harmony with the employer's guarantee of the deferred vested pensions. Because we reverse the district court's holding with respect to the guarantee, we cannot accept the court's reasoning as to Crane's obligation for payments to the pension fund. We must instead examine the agreements themselves and determine the extent of the employer's obligations to contribute to the fund.

Both the Collective Bargaining Agreement and the Pension Plan contain provisions dealing with Crane's obligation for payments to the pension fund. Since 1959, section 18(B)(7)(c) of the Collective Bargaining Agreement has mandated payment of "past service funding liability . . . at the rate of one-twenty fifth [sic] ($\frac{1}{25}$) annually or one three hundredths ($\frac{1}{300}$) each month . . . ." Since the amendments of 1962, section VII(A) of the Pension Plan

---

**2.** The employer urges that the "notwithstanding" phrase has a very limited meaning. When the Collective Bargaining Agreement of 1957 created deferred vested pensions, the parties were apprehensive because the 1950 Pension Plan, which was in effect, provided for two other types of pensions but not for this new kind. They therefore drafted the "notwithstanding" phrase so that the absence of a provision in the Pension Plan for deferred vested pensions would not undermine the validity of the section in the Collective Bargaining Agreement establishing those pensions. Even after the 1962 amendments to the Pension Plan took account of deferred vested pensions, the parties retained the "notwithstanding" phrase in subsequent collective bargaining agreements simply because no further thought was given to the phrase. We need not pass upon the validity of this explanation.

has required Crane "to fund lump sum past service cost at a rate not less than one twenty-fifth (1/25th) annually." The district court summarized the dispute over these passages:

The Union's expectations were that the quoted language required Crane . . to make payments to the trust fund for past service costs so that such costs would be amortized over a period of 25 years. Defendants, however, assert that all that was required by the above-quoted language was that four per cent of the past service costs or liabilities existing in any year be covered by the payments made to the trust fund in that year.

We are convinced that the Union's interpretation is correct. Although section 18(B)(7)(c) of the Collective Bargaining Agreement is ambiguous, section VII(A) of the Pension Plan requires Crane not just to make payments but "to *fund* future service costs each year and to *fund* the lump sum past service cost at a rate not less than one twenty-fifth (1/25th) annually" (emphasis supplied). The meaning of the first of these two infinitive phrases is undisputed. As Crane concedes in its brief before this court, the employer undertook to pay the *entire* cost of future service liability and to pay this cost every year. Because the second infinitive phrase is syntactically parallel to the first and repeats the word "*fund*," it is natural to give it a parallel meaning: Crane promised to pay the *entire* cost of past service liability and to do so at a rate not less than one twenty-fifth every year. Each phrase thus creates an obligation to "fund" certain costs within a specified time. If Crane were to pay the whole cost of past service liability over 25 years, that cost would have to be amortized. Payment of four percent annually would be insufficient.

Crane advances two arguments against the position that it was obligated to amortize the past service cost. First, in 1959 the Union proposed to amend the Collective Bargaining Agreement so that it would explicitly provide for amortization of past service cost. The employer rejected the proposal, and the parties eventually agreed instead upon the language contained in section 18(B)(7)(c) of all the Collective Bargaining Agreements since 1959. This rejection, the employer contends, implies that the section as drafted does not compel the amortization sought by the Union. But even if these events in 1959 would weigh against interpreting section 18(B)(7)(c) of the Collective Bargaining Agreement to call for amortization, the language obligating Crane "to fund the lump sum past service cost" appears instead in section VII(A) of the Pension Plan, a section which was first adopted in 1962. Even on the assumption that the employer would not accede in 1959 to a specific requirement of amortization and agreed only to the ambiguous language of section 18(B)(7)(c) in the Collective Bargaining Agreement, the 1962 amendments to the Pension Plan gave the Union what it had failed to win three years before.

■ Crane's second argument against amortization is that its actuarial reports to the Union gave notice of the employer's interpretation of its duties, that this interpretation excluded amortization, that the Union waited 11 years after this notice before bringing suit, and that the Union's prejudicial delay raises a bar of laches. But because in this action the Union has sued for breach of collective bargaining agreements and has asked for money damages, the suit is most like an action at law, rather than in equity, for breach of contract, and the doctrine of laches does not apply.[3] As stated in Williston,

The doctrine of laches is peculiar to courts of equity and is not ground for an equitable injunction of legal rights. Accordingly, it is only an equitable remedy to enforce a legal right, or an equitable

3. *See International Union (UAW) v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705 n.7, 86 S.Ct. 1107, 1113, 16 L.Ed.2d 192 (1966): "The present suit is essentially an action for damages caused by an alleged breach of an employer's obligation embodied in a collective bargaining agreement. Such an action closely resembles an action for breach of contract cognizable at common law."

right which is wholly unrecognized in a court of law, which can be thus barred. 5 *Williston on Contracts* § 695, at 336 (3d ed. 1961) (footnote omitted). If the Union's delay bars recovery, the bar would have to arise from a waiver of rights, rather than laches. The standard for finding a waiver is strict:

> [A] waiver cannot be lightly inferred. It *clearly and unmistakably* must be established before it can be relied upon as a bar to recovery.

*Radio Television Technical School v. NLRB*, 488 F.2d 457, 461 (3d Cir. 1973) (emphasis supplied and citation omitted). *See NLRB v. Wisconsin Aluminum Foundry Co.*, 440 F.2d 393, 399 (7th Cir. 1971) ("preferable rule" is that waiver be in " 'clear and unmistakable language' ").

■ This record does not reveal a "clear and unmistakable" waiver by the Union. Crane has cited portions of the record indicating that the actuarial reports were sent to the Union and that officers of the Union sometimes discussed the reports, but there is no evidence that in reading these technical reports the Union officers understood the employer to reject amortization of past service costs. Indeed, the reports themselves make reference to amortization of the past actuarial liability remaining after payment of the current annual cost, even if the reports also record actual contributions by the employer which were insufficient to amortize past service liability, and even if the reports reflected Crane's interpretation of its duties. It cannot clearly and unmistakably be inferred that the Union officers assented to the views of the employer's actuaries and waived the rights accorded by section VII(A) of the Pension Plan.

We therefore hold: (1) that Crane did not guarantee to pay the deferred vested pensions; (2) that Crane did obligate itself to pay into the pension funds the amounts necessary to amortize past service costs over 25 years; and (3) that the Union has not waived its rights concerning these payments to the pension fund. The parties have stipulated that the sum owed as a result of such amortization is $199,884, as of January 1, 1978.

The case will be remanded for proceedings not inconsistent with this opinion. Each side to bear its own costs.