**Joseph PIECH, et al.**

v.

**MIDVALE–HEPPENSTALL COMPANY, et al.**

**Howard R. GATTER, et al.**

v.

**MIDVALE–HEPPENSTALL COMPANY, et al.**

**Francis P. HELLER, et al.**

v.

**MIDVALE–HEPPENSTALL COMPANY et al.**

**Civ. A. Nos. 82–1754 to 82–1756.**

United States District Court, E.D. Pennsylvania.

Aug. 22, 1984.

---

Harry C. Barbin, William M. O'Connell, III, Rockledge, Pa., for plaintiffs.

Richard E. Buck, George F. Bihn, III, Erdenheim, Pa., for Midvale-Heppenstall Co.

Margaret L. Hutchinson, Asst. U.S. Atty., W. William E. Seals, Pension Guaranty Corp., Washington, D.C., for PBGC.

## MEMORANDUM AND ORDER

KATZ, District Judge.

Defendant Midvale-Heppenstall Company ("Midvale") has moved for summary judgment in these three related cases, asserting that it has no liability as a matter of law to certain former employees who claim pension and insurance benefits following the closing on April 30, 1976 of its Philadelphia plant.

Plaintiffs in 82–1754 are a class of former Midvale hourly employees who had been represented by the United Steelworkers of America ("the Piech class"). Plaintiffs in 82–1755 are two subclasses of former Midvale salaried employees ("the Gatter and Belz subclasses" or "the Gatter case"). Plaintiffs in 82–1756 are two former Midvale plant guards and the widow of another, who had been represented by the United Plant Guard Workers of America ("the Heller case"). In each case, plaintiffs claim that Midvale is contractually obligated to pay pension and insurance benefits under employee benefit plans in effect when the plant closed. They also contend that Midvale owes these benefits on alternative theories of unjust enrichment and promissory estoppel.[1]

Defendants are Midvale, Heppenstall Company (Midvale's parent), Park Corporation (Midvale's liquidator) and the plans themselves. Midvale was the administrator of the plans until April, 1977, when the Pension Benefit Guaranty Corporation ("PBGC") determined that the plans were unable to pay benefits when due and became the plans' trustee. 29 U.S.C. § 1342. PBGC refused to pay the benefits claimed here.[2] The defendants have filed third-party complaints against PBGC for any damages found in favor of plaintiffs.

## I. THE CONTRACT CLAIMS

### A. *The Piech Case*

Plaintiffs in *Piech* seek pension and insurance benefits under a collective bargaining agreement and pension plan, in effect on April 30, 1976, when the plant closed. They concede that their eligibility for insurance benefits is tied to their eligibility for pension benefits. Plaintiffs' Brief at 14. Each plaintiff was at least 62 years old

---

1. Jurisdiction is based on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 (1974), providing for suits in federal district court by participants or beneficiaries to recover benefits due or to enforce rights under the terms of an employee benefit plan. Plaintiffs assert contractual claims against Midvale, not substantive rights created by ERISA.

2. The refusal of PBGC to pay these plaintiffs benefits is the subject of litigation in the District of Columbia. In *Piech v. PBGC*, No. 82–1131 (D.D.C. July 29, 1983), the District Court upheld the PBGC's position under ERISA. That case is now on appeal.

with more than 10 and less than 15 years of service when the plant closed. PBGC denied them benefits under the pension plan because they did not have 15 years of service as required by the plan's criteria for eligibility. *See Piech v. PBGC*, No. 82–1131 (D.D.C. July 29, 1983).[3]

Article XXIV, § 6 of the collective bargaining agreement provided:

> The sole and complete obligation of the Company to provide or pay for pensions is limited to the amount in the fund on the date of execution of this Agreement, plus the contributions made during the life of this agreement and shall continue to be so limited.

Midvale argues that this clause bars any contractual obligation for pensions on its part beyond what it contributed to the pension fund during the life of the collective bargaining agreement.

■ The state of the law is that Midvale's obligation to continue contributing to the pension fund after closing its business turns essentially on contract. A clear disclaimer of continuing obligation in the governing agreement can be effective. In *United Steelworkers of America v. Crane Co.*, 605 F.2d 714 (3d Cir.1979), the Court held that an employer who had closed its plant and terminated its pension plan had no obligation independent of the plan's fund to pay "deferred vested pensions" to terminated employees. The plaintiffs there met the plan's eligibility requirements of age 40 with 15 years of service, but had not yet reached the retirement age of 65. The Court relied in part on the fact that "in Section VII(c), the Pension Plan absolves the employer of any liability other than its obligation to contribute to the pension

fund." *Id.* at 719. The disclaimer provision, § VII(c), provided:

> Neither the Trustee nor the Company nor the Pension Board, either as a board or as individuals, in any manner guarantees the Trustee fund from loss or depreciation. All payments of pensions as provided in this Plan shall be made solely out of the Trust Fund, and there shall be no liability on the part of the Company to make further contributions to the Trustee in event of termination of the Plan. Neither the trustee nor the Company nor the Pension Board, either as a Board or individuals, shall be in any manner liable for the payment of pension benefits under the Plan.

*Id.* at 716.

However, if the attempted contractual disclaimer to continue to fund benefits does not limit the employer's liability to assets in the pension fund, then other language in the agreement obligating the employer to pay pensions can control. In *Murphy v. Heppenstall Co.*, 635 F.2d 233 (3d Cir. 1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982), the Court found that a terminated pension plan created an independent, direct obligation of the employer to pay pension benefits. It construed two clauses of the pension plan:

> Section 10.2
>
> Any benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this Agreement. In the event that this Agreement is terminated, in whole or in part, the rights of any participant with respect to whom such termination shall have occurred shall, from the date of such termination or partial termination, be fully vested and

**3.** Midvale argues that this class of employees is not eligible for pension benefits at all. The Pension Agreement (§ 2) provided that an employee "shall be entitled to receive a pension upon his retirement" if he then was at least 62 and had at least 15 years of service. Plaintiffs had less than 15 years of service. They claim to be eligible under a Supplemental Letter of Intent which reduced the vesting time to 10 years of service "effective October 1, 1976." In view of the disposition of plaintiffs' contract claims,

there is presently no need to reach the issue whether the Supplemental Letter was in effect at the time the plan was terminated. Nor is there occasion to determine whether certain class members are eligible for vested benefits under the collective bargaining agreement's "CREEP" provision whereby seniority continues to accrue for two years during a layoff (Art. XIX, § 2). *See Piech v. PBGC, supra,* slip op. at 4 n. 4.

nonforfeitable, subject to divestment by reason of death or operation of law, in the benefits established under the Agreement as of the date of such termination or partial termination is effective to the extent those benefits are funded by the Company in accordance with the provisions of Section 8 of this Agreement [sic].[4]

Section 8.1 reads:

For the purpose of supplying the pension benefits herein provided, the Company may establish or cause to be established, a pension trust or trusts or may utilize any existing trust or trusts heretofore established by or on behalf of the Company. The Company is free to determine the manner and means of making provision for funding and paying the pension benefits set forth in this Agreement.

*Id.* at 235. The Court interpreted § 10.2 to mean that when the plan terminated, the participants' rights vest fully to the extent that the employer had an obligation to fund the benefits under § 8. Section 8.1 did not constitute a disclaimer of liability:

In fact, however, the employees have rights to benefits under the Collective Bargaining Pension Agreement, not merely under a pension trust. Section 8.1 establishes that the employer may set up a pension trust, and fund it as he wills, but the provision does not confine the employer's liability for pension benefits to a pension trust. Section 8.1, then, does not obligate the employer to fund any trust; the employer could be directly liable for all pension payments due under the Agreement. Read together, Sections 8.2 and 10.2 thus confirm the employer's continuing direct liability for post-termination pension payments.

*Id.* at 236. *Murphy* rests on a contractual interpretation of a plan where the employer did not limit its liability to plan assets, and where employees had rights to pension benefits under a union contract and pension plan.

The class here is governed by the holding in *Crane.* The collective bargaining agreement includes an explicit disclaimer of direct liability by Midvale, as found in *Crane,* but not in *Murphy.* The Piech plan also includes a provision identical to the first sentence of § 10.2 in *Murphy,* which the Court has construed to mean that plaintiffs' rights vest on plan termination *to the extent that they are funded.* § 11(a), Pension Plan.

Midvale nowhere guaranteed payment of these pension benefits. The collective bargaining agreement limits the provision of pensions to those set forth in the Pension Plan. Art. XXIV, § 1. The contracts in the cases where an employer undertakes to pay pensions apart from the pension trust's assets on termination of the plan are different from the contract in this case. *See In Re White Motor Corp.,* 731 F.2d 372, 374 (6th Cir.1984) (separate letter agreement guaranteed payment in full of vested pension benefits if plan terminated; the Court noted that liability could have been limited to funds already contributed on the date of termination); *UAW v. H.K. Porter Co.,* 82 Lab.Cas. (CCH) ¶ 13,069 (E.D.Mich.1976) (enforcing the employer's direct obligation to pay pension benefits where nothing in the plan limited the employer's liability to assets in the fund at termination date); *Local 1574, IAM v. Gulf & Western Manufacturing Co.,* 417 F.Supp. 191 (D.Me.1976) (collective bargaining agreement guarantee of specific level of pensions overcame limitation of employer liability in pension plan to pension fund assets.)

Midvale's liability for pension benefits is unambiguously limited to the assets in the pension fund. Summary judgment is therefore required on the Piech plaintiffs' contract claims.

### B. *The Gatter Case*

These plaintiffs are former salaried employees covered by pension and insurance plans, but no collective bargaining agree-

---

4. The second "sentence" of Section 10.2 does not parse. Its incomprehensibility detracts from its effectiveness as a disclaimer.

ment. Members of the Belz subclass are receiving pension benefits because they met the eligibility requirements of either age 50 with 15 years of service, or 20 years of service, when the plant closed. These employees claim a higher level of benefits under an amendment to the pension plan of January 1, 1976, which PBGC has refused to pay. The Gatter subclass is not receiving benefits to which they claim entitlement under the 1976 amendment. They had between 10 and 20 years of service, or had reached age 50 without 15 years of service.[5] The issue as to the both subclasses is whether the benefits set forth in the January 1, 1976 amendment are enforceable directly against Midvale.

### 1. Pension Benefits.

■ Midvale argues that it has no direct liability to plaintiffs under § 10.1 of the pension plan:

> The Company by action of its Board of Directors may terminate this Plan at any time. In the event of such termination the Company shall be free to discontinue the payment of benefits theretofore granted under this Plan and to grant no further benefits, and the Company and the Members shall make no further contributions to the Fund.[6]

Significantly, there is no contract language limiting Midvale's obligations to the assets of the fund, unlike the disclaimer provisions in *Crane* which govern the rights of the Piech class.

Plaintiffs contend that benefits are promised them in the Plan:

> 3.1 Any Member who retires upon or after attaining his Retirement Age while in the service of the Company shall be entitled to receive a normal retirement allowance.

They further argue that the January 1, 1976 amendment secures their benefits by requiring Midvale to fund them by its contributions:

> If the Continuous Service of any Member shall terminate for any reason other than retirement or death after he (i) has at least ten (10) years of Continuous Service, he shall be entitled to receive a retirement allowance provided by the Company's contributions.

One issue is whether § 10.1 limits Midvale's liability to assets in the fund at the date of termination in the face of the contradictory promise of a retirement allowance "provided by the Company's contributions" in the January 1, 1976 amendment. Midvale also contradicted the § 10.1 disclaimer in § 6.3 by agreeing to "provide the part of the cost of the Plan not provided by the contributions of Members" through such contributions in time and amount as its Board of Directors determined:

> The Company will provide the part of the cost of the Plan not provided by the contributions of Members. The contributions of the Company shall be paid to the Trustee at such time or times and in such amounts as the Board of Directors at any time and from time to time shall determine; provided, however, that the Company's contributions shall be at least in such amounts that the Plan will continue to be qualified under the applicable provisions of the Internal Revenue Code.

Thus there is ambiguity between (a) the obligation to pay retirement benefits "by the Company's contributions" (1976 amendment), "provide the part of the cost of the Plan not provided by the contributions of Members" (§ 6.3), and provide benefits from those contributions (1976 amendment, § 5.1); and (b) the contradictory contract provision stating that Midvale may terminate the plan, discontinue the payment of benefits, and make no further contributions to the Plan (§ 10.1).

The issue whether Midvale is contractually obligated to pay benefits to plaintiffs beyond what the plan assets provided when the plans terminated cannot be resolved on summary judgment in view of the ambigu-

---

**5.** The parties agree that there was an error in the class definition when the class was certified. The proper definitions are described above.

**6.** Read literally, this language would allow Midvale to discontinue benefits already funded by its contributions before the plant closing.

ous contract provisions. The obligation under the plan is to provide a retirement allowance from the Company's contributions. The 1976 amendment expanded eligibility for benefits to employees with only 10 years of service upon plan termination. In § 6.3, Midvale obligated itself to make sufficient contributions to the fund to meet "the cost of the Plan." Yet § 10.1 provided for discontinuing existing benefits, not granting further benefits, and discontinuing contributions to the fund. Ascertaining the intent of the parties from these conflicting provisions is inappropriate on the present paper record, which does not even reveal which party drafted these ambiguous clauses. The contract does not limit Midvale's obligation to make continuing contributions when it closed its operations with sufficient clarity to justify a grant of summary judgment.

### 2. Insurance Benefits

There are also genuine issues of material fact involved in this class of plaintiffs' claims for insurance benefits.

Life insurance under the plan continues after retirement:

> Upon retirement (as defined on page 7) your Life Insurance will be continued in a reduced amount of $2500 at no cost to you.[7]

Retirement is defined as the attainment of age 65. However, Midvale argues that all insurance coverage, including life insurance, ceases with termination of the plan:

> Except as otherwise described in the preceding section "Lay-off or Leave of Absence", all insurance will terminate if your employment terminates, or if the Group Policies terminate.

The group insurance policies were terminated in connection with the plant closing. Gatter Proposed Pretrial Order, ¶ 58.

Resolution of these ambiguities between (a) the promise that life insurance "will be continued" in a reduced amount upon retirement and (b) the provision terminating insurance is a matter which cannot be re-

solved on summary judgment. *UAW v. Yard-Man, Inc.,* 716 F.2d 1476, 1480 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) (insurance benefits were intended to survive the expiration of a collective bargaining agreement).

### C. *The Heller Case.*

Plaintiffs are Francis Heller and John Soliwóda, former Midvale security guards represented by the United Plant Guard Workers, and the widow of a third guard, John Cassidy. The guards were terminated on April 30, 1976 when the plant closed. They were then covered by a collective bargaining agreement and a pension plan.

Pursuant to a Memorandum of Agreement dated September 20, 1976 between Midvale and the guards union, the guards were reemployed by Heppenstall Company as security for the closed Midvale plant. This Memorandum provided that the collective bargaining agreement and pension plan were terminated effective April 30, 1976 (¶ D.1).

Midvale relies on ¶ D.4 to argue that the Memorandum operates as a full release of all claims of these employees:

> As severance pay *and as full and final resolution of all claims and demands under the prior contract,* each of the ten employees whose names appear on the attached Appendix A [including plaintiffs] shall be paid the sum of two thousand ($2,000) dollars, less deductions required by law.

(Emphasis added.) This clause does not operate as a release of plaintiffs' rights under the pension plan, which are specifically preserved by ¶ D.2 of the Memorandum:

> It is understood and agreed that the pension plan has been terminated and is no longer in force. *Employees covered by this agreement shall receive whatever they are entitled by law to receive un-*

---

7. The Proposed Final Pretrial Order includes a further disputed factual issue whether the amount of life insurance for retirees was re-duced to $2000 effective October 1971. Paragraph 4, p. 16.

*der the terminated plan,* and no provision of this memorandum of agreement or future employment of these employees shall operate to increase or reduce their rights or benefits under the terminated plan.

(Emphasis added.) This paragraph does not limit the surviving rights of employees just to rights against the plan or plan administrator. Rather, it provides that plaintiffs' rights under the plan survive the Memorandum. This does not operate as a release of plaintiffs' claims.

■ Midvale next argues that plaintiffs' direct claims are barred by language in the collective bargaining agreement limiting plaintiffs to recovery from pension fund assets:

> The sole and complete obligation of the Company to provide or pay for pensions is limited to the amount in the fund on the date of execution of this Agreement, plus the contributions made during the life of this Agreement and shall continue to be so limited.

Art. XIX, § 6. This clause is repeated in the Supplemental Letter amending the union contract, effective January 1, 1976 (¶ 3). It is identical to the clause in the Piech contract, *supra* part IA, and bars plaintiffs' claims here.

II. *Promissory Estoppel and Unjust Enrichment*

Plaintiffs in all three cases also seek the pension and insurance benefits on the quasi-contractual theories of unjust enrichment and promissory estoppel.[8] Midvale claims that it is entitled to summary judgment on these issues.

A. *Unjust Enrichment*

■ Plaintiffs' unjust enrichment claims are founded on allegations in the complaints that Midvale reduced its federal income tax liability by deducting its contribu-

tions to the plans so that it was unjustly enriched by plaintiffs' services rendered in reliance on the pension benefits, and by the "recapture of accumulated pension credits created by the forfeiture" of plaintiffs' pensions.[9] These allegations are not verified or contained in affidavits.

Plaintiffs have not raised a genuine issue of material fact on this claim. The Proposed Final Pretrial Orders submitted jointly by the parties state:

> Any tax deductions relating to the [pension plan] relate to contributions previously made to the [pension plan], and all such monies will be used for the benefit of the participants; none have or will be recaptured by the Company. All of the assets of the [pension plan] will be used by the current trustee, PBGC, for the benefit of the participants and beneficiaries thereof.

Proposed Final Pretrial Orders—Piech, ¶ 76; Gatter, ¶ 60; Heller, ¶ 34. In *Knoll v. Phoenix Steel Corp.,* 465 F.2d 1128 (3d Cir.1972), *cert. denied,* 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257 (1973), plaintiffs were participants in a terminated pension plan who claimed benefits on a *quantum meruit* theory, alleging that "they relied upon the pension plan as partial consideration for their continued services to the company." The Court rejected this contention and affirmed a grant of summary judgment against plaintiffs. Under the terms of the plan, plaintiffs were not eligible for benefits because they did not have sufficient length of service. The Court distinguished *Lucas v. Seagrave Corp.,* 277 F.Supp. 338 (D.Minn.1967), which upheld an unjust enrichment theory where the employee-plaintiffs were terminated, but the pension plan continued and the employer used the terminated employees' contributions to meet its future obligations to the pension trust:

> 465 F.2d 1128 (3d Cir.1972), *cert. denied,* 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257 (1973).

---

**8.** The Court has pendent jurisdiction over these claims which arise out of the same transactions as the federal claims. *Knoll v. Phoenix Steel Corp.,* 325 F.Supp. 666, 670 (E.D.Pa.1971), *aff'd,*

**9.** Piech Complaint, ¶¶ 59–61; Gatter Complaint, ¶¶ 51–53; Heller Complaint, ¶¶ 30–32.

There, one company merged with another. Some employees were dismissed as a result of the merger. The pension plan, however, continued in operation. The court held that the dismissed employees were entitled to recover certain money from the pension fund. *The critical fact upon which the district court rested its opinion was that the company was using the premiums, contributed by the dismissed employees, to meet future obligations owed by the company to the pension fund;* yet, simultaneously, the company was denying pension benefits to those employees it had dismissed. In the instant case, however, the pension fund is completely terminated. The company has no further obligations under the terms of the pension fund agreement. It will make no further payments into the plan, and receives no benefits from those who do not share under the termination provisions.

465 F.2d at 1131 (emphasis added). The joint Proposed Final Pretrial Orders in these cases preclude plaintiffs' unjust enrichment claim. The plans' terminations benefit not Midvale but the plan participants.

Plaintiffs' unjust enrichment claim is also barred because this remedy is not necessary to effectuate a statutory policy. *Van Orman v. American Insurance Co.,* 680 F.2d 301 (3d Cir.1982). Plaintiffs in *Van Orman* were plan participants claiming entitlement to a plan's actuarial surplus which would unjustly enrich the plan's sponsors. The Court held that an unjust enrichment remedy was not necessary to effectuate a statutory policy where Congress in ERISA established fiduciary standards to govern the conduct of plan administrators and plaintiffs' rights to the assets of that fund. As the Court stated: "We are particularly reluctant to fashion a federal common-law doctrine of unjust enrichment when such a right would override a

contractual provision." *Id.* at 312. The provisions of the contract determine the employer's liability. *Nachman v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). As the Court said in *Crane:* "We are constrained to look only to the agreements that the Union and the employer concluded, and if these contracts leave the employees unprotected, we are required, reluctant as we may be, to enforce the contractual terms to which the parties have agreed." 605 F.2d at 717. There is no showing of bad faith by Midvale in effectuating the termination. *Hardy v. H.K. Porter Co.,* 417 F.Supp. 1175, 1181–82 (E.D.Pa.1976), *aff'd in part, rev'd in part on other grounds,* 562 F.2d 42 (3d Cir.1977) (citing cases); *cf. Lucas v. Seagrave Corp., supra.*

### B. *Promissory Estoppel*

Plaintiffs' complaints allege in the complaints that Midvale from time to time distributed documents and booklets explaining the benefits, that Midvale frequently advised its employees that if they stayed in Midvale's employ they would receive a pension on retirement, that accruing pension benefits were part of the employees' compensation package, and that plaintiffs were induced to and did rely on these benefits as part of their compensation.[10] The Gatter Proposed Final Pretrial Order contains booklets and letters explaining the plan benefits. No additional factual record has been presented by the parties.[11]

The elements of promissory estoppel are (1) a representation of fact made to a party; (2) reasonable reliance by the party and (3) damage or injury to the relying party from the representation if it is denied. *Higgins v. Carpenters Health & Welfare Fund,* 524 F.Supp. 601, 607 (E.D. Pa.1981); *Rosen v. Hotel and Restaurant Employees,* 637 F.2d 592, 597 (3d Cir.),

---

**10.** Piech Complaint, ¶¶ 43–47; Gatter Complaint, ¶¶ 42–47; Heller Complaint, ¶¶ 22–27.

**11.** At oral argument, plaintiffs' counsel indicated that plaintiffs would testify to representations that they would get benefits.

*cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981).

This record does not show whether Midvale promised plaintiffs more than their rights under their contracts—the pension plans and collective bargaining agreements. Midvale's motion papers do not put to rest whether the Company orally undertook a liability for the pensions. Nor do the plaintiffs set forth the oral representations on which they rely. The booklets explaining the retirement plan (P–3, P–4) and the letters (P–6 to P–9) refer to the plan documents for complete descriptions, and do not promise any additional benefits to these employees. *Higgins, supra.* Mere promises of benefits under a pension plan will not support a claim of promissory estoppel without evidence that plaintiffs were induced to rely reasonably on representations that were contrary to or more generous than the contract documents.

Since neither side has filed affidavits dealing with the promissory estoppel issue, I will grant leave to both parties to file such affidavits within twenty days. The issue is whether plaintiffs could reasonably believe that a promise of permanent benefits was made even if the plant were closed and the plans terminated. *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325 (3d Cir.1984).

## CONCLUSION

The Gatter case (82–1755) will go to trial. All liability issues will be bifurcated from the damages issues. PBGC's motion to bifurcate the issue of its liability is denied. The contract claims in the Piech (82–1754) and Heller (82–1756) actions are dismissed. The unjust enrichment claims in all three actions are dismissed. Decision on the promissory estoppel claims in all three actions is reserved pending the filing of affidavits. Defendants' oral motion for an order under 28 U.S.C. § 1292(b) is denied because an immediate appeal at this stage would not materially advance the ultimate termination of these lawsuits.